JEFFREY KALIEL (CA 238293)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW, Suite 1000
Washington, DC  20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*jkaliel@tzlegal.com*

JEFFREY M. OSTROW (*pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com

*Counsel for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE FARRELL, RONALD ANTHONY DINKINS, LARICE ADDAMO, and TIA LITTLE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs<br><br>vs.<br><br>BANK OF AMERICA. N.A.,<br><br>Defendant | CLASS ACTION<br><br>CASE NO. 3:16-cv-00492-L-WVG |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, JOANNE FARRELL, RONALD ANTHONY DINKINS, LARICE ADDAMO, and TIA LITTLE, on behalf of themselves and all others similarly situated, sue defendant BANK OF AMERICA, N.A., and allege:

### INTRODUCTION

1) Plaintiffs bring this national class action seeking redress for an illegal practice that Bank of America, N.A. ("Bank of America" or "BofA") perpetrates on its checking and money market account customers.  Plaintiffs assert this action

1 pursuant to Fed. R. Civ. P. 23, on behalf of herself and all others similarly situated, for damages and other relief arising from Bank of America's routine practice of wrongfully assessing its customers so-called "Extended Overdrawn Balance Charges."

2) As alleged below in detail, this purported "charge" is deducted from a customer's account *in addition to* an initial $35.00 overdraft fee if and when the customer's overdraft status remains in effect for a period of five (5) days. Bank of America, in reality, is charging its customers interest for the use, forbearance, or detention of money. The amount charged far exceeds the permissible limit under the National Bank Act.

## PARTIES

3) Plaintiff Joanne Farrell is a citizen and resident of the State of California and has had a checking account with defendant Bank of America in San Diego, California, at all times material hereto.

4) Plaintiff Larice Addamo is a citizen and resident of the State of New York and has had a checking account with defendant Bank of America in Copiague, New York, at all times material hereto.

5) Plaintiff Ronald Anthony Dinkins is a citizen and resident of the State of California and has had a checking account with defendant Bank of America in Santa Monica, California, at all times material hereto.

6) Plaintiff Tia Little is a citizen and resident of the state of Maryland and has had a checking account with Bank of America in Greenbelt, Maryland, at all times material hereto.

7) Defendant Bank of America is a national bank with its headquarters and principal place of business located in Charlotte, NC. Among other things, BofA is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative classes, which includes the issuance of debit cards for use by its customers in conjunction with their checking accounts. BofA

operates banking centers, and thus conducts business, throughout the State of California and the United States

## JURISDICTION

8) This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, namely the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

9) Bank of America regularly and systematically provides retail banking services throughout the State of California, including in this district, and provides retail banking services to its customers, including Plaintiffs and members of the putative Class. As such, it is subject to the jurisdiction of this Court and the mandate of the National Bank Act.

## VENUE

10) Venue is likewise proper in this district pursuant to 28 U.S.C. § 1391 because Bank of America is subject to personal jurisdiction in this Court and regularly conducts business within this district through its numerous branches. Additionally, a substantial part of the events giving rise to the claims asserted herein occurred and continue to occur in this district.

## OVERVIEW

11) The gist of the Extended Overdrawn Balance Charge is as follows: If Customer "A" were to overdraft his or her account by $500.00, the bank first charges an overdraft fee of $35.00 per transaction. However, if Customer "A" fails to replenish his or her account to bring the balance to a positive figure within five (5) days, then the bank deducts yet another $35.00 from the account of Customer "A" for having extended this credit.

12) Unlike an initial overdraft fee, the Extended Overdrawn Balance Charge is an *additional* charge to a customer for which the bank has provided nothing new.

The charge is based solely on the alleged indebtedness to the bank remaining unpaid by the customer for a period of time.

13) By way of background, overdraft fees have been a substantial source of revenue for banks, and today those numbers are proliferating. As technology has rapidly grown and provided banking customers new ways of accessing the money in their accounts, overdraft episodes and the attendant imposition of overdraft fees have skyrocketed. Recent reports from the federal Consumer Financial Protection Bureau ("CFPB"), for example, show that a broad investigation has been launched regarding bank overdraft practices and procedures due to its concern that the growing cost of overdraft practices could place banking customers at unnecessary risk. In 2012 alone, banks took in approximately $32 billion in overdraft-related fees.

14) As a recent CFPB report reflects, "sustained negative balance" fees are becoming popular with banks and account for nearly 10% of total overdraft-related fees collected by banks which impose such charges. According to its latest report issued in July of 2014, once a bank charges its customer a sustained overdraft fee on day five, the negative balance is likely cured by the customer within just a few days, rather than weeks. As such, the bank's extension of credit to its overdrawn customer is typically very short-term. Moreover, most negative balances created by an overdraft are not high figures. Nearly two-thirds of transactions that cause overdrafts were for $50 or less. As these statistics highlight, a bank's exposure for carrying a customer's overdraft is ordinarily very small and limited. But rather than charging legally permissible interest until its customer cures the overdraft balance, Bank of America instead charges a purported Extended Overdrawn Balance Charge that in reality is interest at an illegal rate.

## BANK OF AMERICA'S PRACTICE

15) The specific issue in this case is BofA's intentional practice of deducting Extended Overdrawn Balance Charges from the accounts of its customers, including Plaintiffs and others similarly situated. Under this practice, if the customer fails to

repay the full amount of the overdraft within five (5) days, the bank then charges a sustained overdraft fee of $35.00 – as reflected on Bank of America's Personal Fee Schedule.  BofA renders no service to its customers in exchange for charging this extra fee other than advancing money to a customer's account in an amount to cover the overdraft.  BofA uses the fact that it has loaned funds to its customer as a pretext to justify charging that customer a secondary service charge that exceeds lawful limits.

16)     In Bank of America's written "Deposit Agreement and Disclosures" with its customers including Plaintiffs, the overdraft provisions appears on page 12. That provision states as follows:

### Extended Overdrawn Balance Charge

The Extended Overdrawn Balance Charge is an overdraft fee. This fee is in addition to Overdraft item and NSF: Returned Item fees that may apply to your account for each overdraft or returned item. This additional charge applies to your account when we determine that your account has been overdrawn for 5 or more consecutive business days. You can avoid this fee by promptly covering your overdraft – deposit or transfer enough available funds to cover your overdraft, plus any fees we assessed, within the first 5 consecutive business days that your account is overdrawn.

Under this provision Bank of America allows itself to charge a fee against any checking or money market account merely by virtue of the customer failing to pay the bank a specific sum of money (the amount of the overdraft) for a period of five (5) days.  There is nothing in BofA's written materials disclosing that this additional "fee" is in reality a charge of interest on extended credit.

17)     In Farrell's case, her monthly bank statements for her "BofA Core Checking" show that she went into "overdraft" status on October 13, 2015, and remained in that status for thirteen days. On day seven, (October 20, 2015), BofA charged her an Extended Overdrawn Balance Charge of $35.00. During that limited period, Farrell's negative account balance fluctuated from -$3.59 to -$284.86.

18) The $35.00 sustained overdraft fee that BofA charged Farrell was in addition to six overdraft charges totaling $210.00 that Bank of America also charged her during this same time period for the two transactions that created her "overdraft" status in the first place.

19) In Addamo's case, her monthly bank statement for her "BofA Core Checking" show that she went into "overdraft" status on June 6, 2016, and remained in that status for eleven days. On day seven, (June 13, 2016), BofA charged her an Extended Overdrawn Balance Charge of $35.00. During that limited period, Addamo's negative account balance fluctuated from approximately $-4.80 to approximately -$370.19.

20) The $35.00 sustained overdraft fee that BofA charged Addamo was in addition to four overdraft charges totaling $140 that Bank of America also charged her during this same time period for the four transactions that created her "overdraft" status in the first place.

21) In Dinkins' case, his monthly bank statement for his BofA Core Checking" show that he went into "overdraft" status on January 19, 2016, and remained in that status for twelve days. On day seven (January 26, 2016), BofA charged him an Extended Overdrawn Balance Charge of $35.00. During that period, his negative account balance fluctuated from approximately -$9.31 to approximately -$44.31.

22) The $35.00 sustained overdraft fee that BofA charged Dinkins was in addition to the initial overdraft charge of $35.00 that Bank of America also charged him during this same time period for the transaction that created his "overdraft" status in the first place.

23) In Little's case, her monthly bank statement for her "BofA Core Checking" shows that she went into "overdraft" status on July 5, 2015, and remained in that status for ten days. On day seven, (July 12, 2016), BofA charged her an Extended Overdrawn Balance Charge of $35.00. During that limited period, Little's

6
FIRST AMENDED CLASS ACTION COMPLAINT

negative account balance fluctuated from approximately -$7.87 to approximately -$77.87.

24) The $35.00 sustained overdraft fee that BofA charged Little was in addition to the two overdraft fees of $35.00 that Bank of America also charged her during this same time period for the two transactions that created her "overdraft" status in the first place.

## CLASS ACTION ALLEGATIONS

25) Plaintiffs bring this action on their own behalf and all others similarly situated pursuant to Fed. R. Civ. P. 23. The Class includes:

> All holders of a BANK OF AMERICA checking and/or money market account who, within the two-year period preceding the filing of this lawsuit, incurred one or more Extended Overdrawn Balance Charges.

26) Excluded from the class are Bank of America, its subsidiaries and affiliates, its officers, directors and member of their immediate families and any entity in which defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

27) Plaintiffs reserve the right to modify or amend the definition of the proposed Class and/or to add Subclasses if necessary before this Court determines whether certification is appropriate.

28) This case is properly brought as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and all requirements therein are met for the reasons set forth in the following paragraphs.

29) *Numerosity under Fed. R. Civ. P. 23(a)(1)*. The members of the Classare so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Bank of America's records. BofA has the

7
FIRST AMENDED CLASS ACTION COMPLAINT

administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiffs.

30) *Commonality under Fed. R. Civ. P. 23(a)(2)*. There are numerous questions of law and fact common to the Class relating to Bank of America's usurious business practice at issue herein and those common questions predominate over any questions affecting only individual Class members.  The common questions include, but are not limited to:

    a) Whether Bank of America charged interest to its customers under the guise of a "sustained" overdraft fee in amounts that violate applicable usury laws;

    b) Whether Bank of America developed and engaged in an unlawful practice that mischaracterized or concealed the true usurious nature of the "sustained" overdraft fee;

    c) Whether Bank of America charged its customer a "fee" that bears no relationship to the actual costs and risks of covering insufficient funds transactions; and

    d) Whether Plaintiffs and other members of the Class have sustained damages as a result of Bank of America's wrongful business practice described herein, and the proper measure of damages.

31) *Typicality under Fed. R. Civ. P. 23(a)(3)*.  Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by Bank of America, as described herein.

32) *Adequacy of Representation under Fed. R. Civ. P. 23(a)(4)*.  Plaintiffs are more than an adequate representative of the Class in that they have a Bank of America checking account and they have suffered damages,  as a result of Bank of America's usurious business practice.  In addition:

a) Plaintiffs are committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b) There is no hostility of interest between Plaintiffs and the unnamed Class members;

c) They anticipate no difficulty in the management of this litigation as a class action; and

d) Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

33) *Predominance under Fed. R. Civ. P. 23(b)(3)*. The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues. As such, the "commonality" allegations (paragraph 28 and subparts) are restated and incorporated herein by reference.

34) *Superiority under Fed. R. Civ. P. 23(b)(3).* A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of Bank of America are enormous, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Bank of America's misconduct will proceed without remedy. In addition, even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which

might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

35) All conditions precedent to bringing this action have been satisfied and/or waived.

## **VIOLATION OF NATIONAL BANK ACT**
## **(12 U.S.C. §§ 85, 86)**

36) Plaintiffs reallege and incorporate all allegations in paragraphs 1 through 34 as if set forth fully herein.

37) Interest, by definition, is compensation for the use or forbearance of money or as damages for its detention. That is exactly the nature of BofA's Extended Overdrawn Balance Charge. Any such charges imposed on a customer for use or forbearance of money or as damages for its detention – no matter how labelled by Bank of America – are in fact interest and in this case usurious, as alleged below.

38) Claims for usury against a national bank such as Bank of America are governed exclusively by certain provisions in the National Bank Act–specifically, 12 U.S.C. §§ 85, 86. Under § 85, a national bank may charge interest on any loan or debt at the *greater* of two options. Option (1) is "the rate allowed by the laws of the State ... where the bank is located." And option (2) is "1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located."

39) Under option (1), a bank is "located" only in the state that is designated in its organization certificate. BANK OF AMERICA is located in North Carolina. Under North Carolina law, the "legal rate of interest shall be eight percent (8%) per annum for such time as interest may accrue, and no more." N.C.G.S.A. § 24-1.

40) Under option (2), the discount rate for the Federal Reserve Bank of Richmond (which covers North Carolina) was .75% for primary credit and 1.25% for

secondary credit at all times material. As such, the maximum rate under option (2) would be 2.25%.

41) Since option (1) is greater than option (2), 8% would be the maximum interest rate that Bank of America could legally charge its customers in this context under 12 U.S.C. § 85. By covering overdrafts, Bank of America has knowingly extended credit to Plaintiffs and others similarly situated for use in their checking and/or money market accounts. Such extensions of credit are loans made without a specific loan agreement. In fact, 12 U.S.C. § 84 defines the term "loans and extensions of credit" as including any and all direct or indirect advances of funds to a person made on the basis of any obligation of that person to repay the funds. In addition, federal banking regulators in guidance issued to national banks on the subject of overdraft items have expressly stated, "When overdrafts are paid, credit is extended." Joint Guidance on Overdraft Protection Programs, 70 Fed. Reg. 9127, 9129 (Feb. 24, 2005).

42) Although Bank of America is only permitted to charge Plaintiffs and others similarly situated a *maximum* of 8% annualized interest on these loans and extensions of credit, Bank of America has knowingly charged and collected, or attempted to collect, "sustained" overdraft fees from Plaintiffs and others similarly situated that far exceeded this permissible rate.

43) Using the maximum amount of Plaintiff Farrell's overdraft during the relevant period ($284.86) and applying a 8% annual interest rate over a thirteen-day period, the maximum amount that Bank of America was legally permitted to charge Farrell was only 81¢. Instead, BofA charged Farrell $35.00 for that thirteen-day period – which is *over 43 times* the maximum legal amount.

44) A charge of $35.00 for a five-day period on Farrell's negative balance (which fluctuated from $3.59 to $284.86) translates to an effective annualized interest rate of between 897% and 71,170%.

45) Using the maximum amount of Plaintiff Addamo's overdraft during the relevant period (approximately $370.19) and applying a 8% annual interest rate over a five-day period, the maximum amount that Bank of America was legally permitted to charge Addamo was only 41¢.  Instead, BofA charged Addamo $35.00 for that five-day period – which is *over 85 times* the maximum legal amount.

46) A charge of $35.00 for a 5-day period on Addamo's negative balance (which fluctuated from approximately $4.80 to $370.19) translates to an effective annualized interest rate of between 690% and 53,229%.

47) Using the maximum amount of Plaintiff Dinkins's overdraft during the relevant period (approximately $44.31) and applying a 8% annual interest rate over a five-day period, the maximum amount that Bank of America was legally permitted to charge Dinkins was only 5¢.  Instead, BofA charged Dinkins $35.00 for that five-day period – which is *over 700  times* the maximum legal amount.

48) A charge of $35.00 for five-day period on Dinkins's negative balance (which fluctuated from approximately $9.31 to $44.31) translates to an effective annualized interest rate of between 5,776% and 27,444 %.

49) Using the maximum amount of Plaintiff Little's overdraft during the relevant period (approximately $77.87) and applying a 8% annual interest rate over a five-day period, the maximum amount that Bank of America was legally permitted to charge Little was only 9¢.  Instead, BofA charged Little $35.00 for that five-day period – which is *over 389 times* the maximum legal amount.

50) A charge of $35.00 for a five-day period on Little's negative balance (which fluctuated from approximately $7.87 to $77.87) translates to an effective annualized interest rate of between 3,281% and 32,465%.

51) The sustained overdraft fees charged to Plaintiffs and others similarly situated for such advances of money are egregiously high, usurious and illegal.

52) By labeling its charge as a "charge," Bank of America cannot mask the true nature of the charge.

53) As a direct and proximate result of Bank of America's statutory breaches, Plaintiffs and those similarly situated have sustained damages.

54) The usurious transactions at issue all occurred less than two years prior to the date of this action.

55) Plaintiffs and those similarly situated are entitled to recover twice the amount of the usurious interest they have paid under 12 U.S.C. § 86, which provides: In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, *twice the amount of interest thus paid from the association taking or receiving the same…*. (Emphasis added)

56) Plaintiffs and those similarly situated hereby demand recovery of the amounts owed to them as a result of the violations asserted herein.

WHEREFORE, Plaintiffs demand judgment against defendant Bank of America for themselves and the Class members as follows:

(a) Certifying this matter as a class action pursuant to Fed. R. Civ. P. 23;

(b) Designating Plaintiffs as appropriate Class representatives;

(c) Awarding Plaintiffs and the Class damages (including twice the amount of the usurious interest paid), prejudgment interest from the date of loss, and their costs and disbursements incurred in connection with this action, including reasonable attorney's fees, expert witness fees and other costs; and

(d) Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

| | | |
|---|---|---|
| 1 | Dated:  March ___, 2017 | s/ Jeffrey Kaliel |
| 2 | | HASSAN A. ZAVAREEI (CA 181547) |
| | | JEFFREY KALIEL (CA 238293) |
| 3 | | **TYCKO & ZAVAREEI LLP** |
| | | 1828 L Street, NW, Suite 1000 |
| 4 | | Washington, DC  20036 |
| 5 | | Telephone: (202) 973-0900 |
| | | Facsimile: (202) 973-0950 |
| 6 | | *jkaliel@tzlegal.com* |
| | | *hzavareei@tzlegal.com* |

JEFFREY M. OSTROW (*pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
ostrow@kolawyers.com

Robert C. Gilbert (*pro hac vice*)
**KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT**
2800 Ponce De Leon Blvd, Suite 1100
Coral Gables, FL 33134
Telephone: 305-529-8858
Facsimile: 954-525-4300
*gilbert@kolawyers.com*

BRYAN GOWDY (*pro hac vice*)
**CREED AND GOWDY, P.A.**
865 May Street
Jacksonville, FL 32204
Telephone: 904-350-0075
Facsimile: 904-503-0441
*bgowdy@appellate-firm*.com

JOHN JOSEPH UUSTAL (*pro hac vice*)
CRISTINA MARIA PIERSON (*pro hac vice*)
**KELLEY UUSTAL PC**
500 North Federal Highway, Suite 200
Fort Lauderdale, FL 33301
Telephone: 954-522-6601
*johnet@kulaw.com*

| | |
|---|---|
| 1 | WALTER W. NOSS (CA 277580) |
| 2 | **SCOTT + SCOTT LLP** |
| 3 | 707 Broadway,10th Floor |
|  | San Diego, CA 92101 |
| 4 | Telephone: (619) 233-4565 |
|  | Facsimile: (619) 233-0508 |
| 5 | *wnoss@scott-scott.com* |

*Counsel for Plaintiffs and the Proposed Class*