```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4    JOANNE FARRELL, on behalf of    .
      herself and all others         .
 5    similarly situated,            .
                                      . Docket
 6              Plaintiff,           . No. 16-cv-00492-L-WVG
                                      .
 7                   v.              . June 18, 2018
                                      . 11:00 a.m.
 8    BANK OF AMERICA, N.A.,          .
                                      .
 9              Defendant.           . San Diego, California
      . . . . . . . . . . . . . . . .

10

11                TRANSCRIPT OF FINAL APPROVAL HEARING
                  BEFORE THE HONORABLE M. JAMES LORENZ
12                   UNITED STATES DISTRICT JUDGE

13

                            A-P-P-E-A-R-A-N-C-E-S
14
      For the Plaintiff:     Kopelowitz Ostrow Ferguson
15                           Weiselberg Gilbert
                             One West Las Olas Boulevard, Suite 500
16                           Fort Lauderdale, Florida 33301
                             By:  JEFFREY M. OSTROW, ESQ.
17                           – and –
                             Tycko & Zavareei LLP
18                           1828 L Street, N.W., Suite 1000
                             Washington, DC 20036
19                           By:  HASSAN ZAVAREEI, ESQ.
                             – and –
20                           Kelley Uustal PC
                             500 North Federal Highway, Suite 200
21                           Fort Lauderdale, Florida 33301
                             By:   JOHN R. HARGROVE, ESQ., ESQ.
22                                 CRISTINA M. PIERSON, ESQ.
                             – and –
23                           Creed & Gowdy
                             865 May Street
24                           Jacksonville, Florida 32204
                             By:  BRYAN S. GOWDY, ESQ.

25    ///
```

```
1                  A-P-P-E-A-R-A-N-C-E-S (continued)

2

3   For the Defendant:
                           O'Melveny & Meyers LLP
4                          610 Newport Center Drive, 17th Floor
                           Newport Beach, California 92660-6429
5                          By:  DANIELLE OAKLEY, ESQ.
                           – and –
6                          O'Melveny & Meyers LLP
                           400 South Hope Street, 18th Floor
7                          Los Angeles, California 90071-2899
                           By:  MATTHEW W. CLOSE, ESQ.
8
    For the Objector RACHEL THREATT:
9                          Competitive Enterprise Institute
                            Center for Class Action Fairness
10                         1310 L Street NW, 7th Floor
                           Washington, DC 20005
11                         By:  THEODORE H. FRANK, ESQ.

12

13

14

15

16

17

18

19

20
    Court Reporter:        Chari L. Bowery, RPR, CRR
21                         USDC Clerk's Office
                           333 West Broadway, Suite 420
22                         San Diego, California 92101
                           chari_bowery@casd.uscourts.gov
23
    Reported by Stenotype, Transcribed by Computer
24

25
```

1        SAN DIEGO, CALIFORNIA; JUNE 18, 2018; 11:00 A.M.

2                              -o0o-

3        THE CLERK:  Attorneys, please state your names for

4   the record.

5        MR. OSTROW:  For class counsel and plaintiffs, Jeff

6   Ostrow.

7        MR. ZAVAREEI:  Hassan Zavareei, Your Honor, on behalf

8   of plaintiffs and class counsel.

9        MR. HARGROVE:  And likewise, on behalf of plaintiffs,

10  John Hargrove.

11       MS. PIERSON:  Cristina Pierson, also on behalf of

12  class counsel.

13       MR. GOWDY:  Bryan Gowdy on behalf of class counsel

14  and plaintiffs.

15       THE COURT:  Okay.

16       MS. OAKLEY:  Good morning, Your Honor.  Danielle

17  Oakley on behalf of Bank of America.

18       MR. CLOSE:  Good morning, Your Honor.  Matthew Close,

19  also for Bank of America.

20       THE COURT:  All right.  Very good.

21       MR. FRANK:  Theodore Frank on behalf of Objector

22  Rachel Threatt.

23       THE COURT:  Okay.  All right.  This is primarily to

24  hear from the parties and objectors as to the proposed

25  agreement, which I am familiar with.  It's pretty hard to

1    switch from criminal to civil just like that all the time.

2         In any case, that being said, let's start with class

3    counsel and anything they want to add.

4              MR. OSTROW:  Good morning, Your Honor.  Jeff Ostrow

5    for class counsel and plaintiffs.

6         We represent the named plaintiffs in this class that you

7    provisionally certified -- it is a settlement class -- back in

8    December of 2017.  Thank you for doing our substitution of our

9    original named plaintiff the other day and for the other

10   housekeeping on the orders yesterday.

11        Obviously, we are here today for final approval of our

12   class settlement as well as to have the Court make a

13   determination as to the reasonableness of our fee application,

14   service awards, and cost reimbursement.

15        The Court just told us that it's very familiar with the

16   settlement.  How would the Court like me to proceed this

17   morning?  I can go through the settlement in detail and all the

18   elements of why this is appropriate for a class settlement for

19   certification, or I can answer specific questions with respect

20   to the settlement.

21        When we are done with that aspect, my co-counsel, Hassan

22   Zavareei, will be handling the objections that were filed, or

23   the responses to the objections.

24             THE COURT:  I will leave it up to you.  Between my

25   clerks and myself, I think we are pretty familiar with all of

1    the facts.  No need to go into great detail, but if there are a

2    couple of things you want to stress, rather than go through the

3    whole thing.

4         MR. OSTROW:  That will be fine.  I will avoid talking

5    about procedural history and the actual claim itself and talk

6    more about the actual settlement and why this is what I believe

7    and my co-counsel believe to be an excellent class settlement.

8         In support of our motion for settlement, we have filed a

9    number of declarations, as the Court knows.  We filed

10   declarations from the bank, which discussed the damages, which

11   I think was important to the Court to understand how we

12   calculated the damages and how we got to the percentage that we

13   settled for.  We have declarations filed by the administrator,

14   Epic Systems; Cameron Azari, which discussed the notice plan

15   and how we implemented what the Court had ordered in the

16   original order.

17        We were very pleased to announce we had -- 93 percent of

18   the class was notified by direct postcard notice as well as

19   e-mail notice, and that information came directly from the

20   bank, where we were able to get the contact information and

21   send notice directly.  Co-counsel and I have handled probably

22   50 cases against banks in the last ten years, Your Honor, and

23   this is probably the best notice type of that you could

24   possibly have, so we are pleased to announce that to the Court.

25        There was a declaration of CAFA notice that was sent out.

1    I think that's particularly important and it's become more

2    important recently in that it gives an opportunity for the

3    Department of Justice, as well as the attorney general of each

4    state, including the District of Columbia, to analyze the

5    settlement, and recently, they have been objecting to

6    settlements.  So they have an opportunity, on behalf of all the

7    people in their state, to review the terms of the settlement,

8    the fee application, and there have been courts that have

9    halted approvals based on that.  I think you are going to start

10   seeing that a lot more.  There's not a single objection filed

11   by any of those.

12       We filed a declaration for the timely exclusions.  There

13   were only 100 opt-outs out of seven million.  I think that says

14   a lot about the settlement itself.  We had 11 timely

15   objections.  Co-counsel will speak to those, but those mostly

16   related to the fees.

17       We had a fee expert file a declaration in support of our

18   application.  He is the premier expert from Vanderbilt

19   University, Brian Fitzpatrick.

20       And we recently filed a declaration of Deborah Goldstein,

21   from the Center for Responsible Lending, which is our proposed

22   *cy pres* recipient in the event that there are any funds left

23   over after a second distribution.

24       So, just some of the heights of this case, Your Honor,

25   without talking about procedural history, the reason why this

1    is extraordinary is because there have been seven cases -- six

2    have been dismissed -- on the same exact theory, one of them

3    against the same bank, in the Southern District of Florida,

4    went up to the Eleventh Circuit, and it was dismissed and

5    affirmed and basically said, "You have no case."

6        Your Honor ruled on the motion to dismiss.  We survived

7    that.  They attempted to appeal it.  The case was stayed.  And

8    we ultimately reached a settlement.

9        When we set out to bring these cases for fees against

10   banks, Your Honor, our primary goal is to stop the practice.

11   This is, in our opinion, an awful practice.  It was yielding

12   $20 million a month in revenue to the bank.  And our first and

13   foremost goal was to stop it because these are the people, the

14   customers of the bank, that are paying the most amount of money

15   back in fees and the people that have the least amount of

16   money.

17       So we were extremely pleased that they have committed to a

18   five-year cessation of the practice, have $1.2 billion, and

19   there's been a declaration by the bank filed in support of

20   that.  And I think that is a monumental, huge goal, and we are

21   very pleased to say we have made incredible changes in the

22   banking industry for the better, including this one, and that's

23   in the face of all those dismissals.

24       The cash portion of this and the debt relief portion,

25   which we look at as almost one and the same because whether you

1    are getting money or you have had the ability of not having to

2    pay money you owe, is what I consider gravy on the dinner,

3    here, because the cessation of the practice is what we were

4    after, and the cash and the debt relief of $66.6 million in

5    itself I think is fantastic, but that is just a little bit

6    extra for the class members to have.  When you look at it in

7    the totality, it is an average between the two of $10 per

8    person they are going to get back, and that's gross, before any

9    fees are deducted from there.

10        The notice administration costs are approximately two, and

11   recently have been updated to possibly $3 million.  Those are

12   paid separately by the bank.  That is another benefit that is

13   to the settlement class.  It is not something that we have

14   calculated in our fee application, but it's something that's

15   real, and the bank will tell you those dollars -- they have

16   been paying them and will continue to pay them.

17        Some other highlights of this settlement that you don't

18   see in a lot of other ones, there's no claims process.  This is

19   a direct distribution, pro rata, based upon the number of

20   EOBC -- which the Court is probably familiar with that

21   definition by now -- that each class member incurred.  So you

22   are either going to get a direct deposit into your account, if

23   you are a current account holder, or you are going to get a

24   hard-copy check sent to you, or you are going to get your debt

25   wiped off of their books if you have less than $35 that you

1    owed at the time that you left the bank, or if you have in

2    excess of 35, you will get a full $35.

3        Your Honor, I will finish up by saying we originally

4    asked, in our notice to the class, for the ability to come

5    before Your Honor to ask for 25 percent of the settlement

6    value, which was $66.6 million.  In actuality -- and that's

7    what is in our paper -- the settlement value is $69.6 million,

8    because you need to add in the notice and administration costs.

9        When you do that, our application, which we originally

10   said we were going to come before the Court and ask for

11   $16.5 million -- Mr. Zavareei will talk about that those

12   objections -- but we voluntarily agreed to come before you and

13   ask for $14.5 million.  That is roughly 21 percent of the

14   settlement value.  When you add in the injunctive relief value

15   of 1.2 billion real dollars -- which courts have awarded fees

16   on injunctive relief, the value, when you can quantify it,

17   which we clearly did -- you are looking at one percent.

18       And I think, after the monumental changes that were made

19   in this industry, the real dollars that are going to these

20   people, that our request is fair and reasonable.

21       In addition, Your Honor, we have asked for a service award

22   for the named plaintiffs of $5,000 each.  A couple of days ago,

23   you substituted, for one of our deceased plaintiffs, the four

24   adult children.  With respect to those four, they would split

25   the $5,000; $1,250 each.

1       We have advanced costs in expenses in this case below

2   north of $53,000, Your Honor, and we believe that those

3   expenses are fair and reasonable.  We took all our travel and

4   hotel accommodations -- we don't go out and drink bottles of

5   wine and do any of those fancy things -- and we cut them

6   straight up in half so that nobody can contest the

7   reasonableness of those.  And we also didn't charge for certain

8   internal things, copying charges, phone calls, things like

9   that.

10      We when we come before a Court, we take our obligation on

11  behalf of the class extremely seriously.  We expect, when you

12  have a class against the second largest bank in the country,

13  with seven million class members, you are going to get some

14  objections.  We believe it is opportunistic.  My co-counsel

15  will talk more about that.  But we are extremely pleased, and

16  we take our obligations seriously, and we have come before

17  courts around the country with very, very fine settlements such

18  this.  We know we have made some serious changes, and we think

19  our fee application is reasonable.

20          THE COURT:  14.5 million, that was after some

21  meet-and-confer?  Is that how that resolved?  Because you were

22  first, originally, at 16 million or thereabouts.

23          MR. OSTROW:  Yes.  After the objection period closed

24  and we realized which parties were objecting, we were able to

25  determine what the issues were, and 99 percent of the issues

1   related to fees or things that are totally outside the scope of

2   the settlement.  We did something that I think is pretty

3   unique.  In 20-something years of practicing, I have never done

4   it before, and I think there's some value in it.  We reached

5   out to every one of the objectors, if they were pro se, or

6   their counsel, and invited them to a mediation.  And we did it

7   in Washington, D.C.  And we were there; objectors, or their --

8   pro se, could appear by phone.  Mr. Frank had an opportunity to

9   appear.  He didn't want to appear.

10       And we basically said, "Let's talk about your objections."

11  And they wanted to talk about fees.  And we suggested, "If we

12  reduced the fee a couple of million dollars to the class, is

13  that something, at 14.5, you all would find reasonable?"  And

14  we believe that we left with a consensus -- I can't say that

15  for Mr. Frank because he wasn't there -- that the consensus

16  was, "Yes, that is reasonable."

17       So we decided that we would, in our final application,

18  modify and come before you and ask for that number.  We know

19  that that's just kind of eliminating some of the background

20  noise.  This Court -- it is up to you to determine what is

21  appropriate, fair, and reasonable, and we are going to go with

22  what you do.  But we figured we would try to resolve any issues

23  as it relates to that.

24       So that process, to the extent that we got a consensus --

25  even though I believe there was a filing saying there wasn't --

1   we believe should be helpful for this Court, when you realize

2   out of seven million people, you have now eliminated all but

3   perhaps one or two that are objecting, and you can, I guess,

4   decide what the purpose of them remaining or standing on their

5   objections are.

6         THE COURT:  All right.  Very good.  Thank you.

7         Yes.  I won't really get into any questions at the moment

8   because you apparently indicated you have someone who will

9   respond to the objections.  In the analysis, obviously, to a

10  certain degree, how you treat that $29 million in debt relief,

11  that kind of plays into the configuration of percentage.

12        But I have already seen the responses at this point, but

13  notwithstanding that, I will let anyone else now -- anybody on

14  your side want to add anything at this point, or do you want to

15  get over --

16        MR. OSTROW:  I think Mr. Zavareei would, but just a

17  last comment on the debt relief.  I know the objectors would

18  like to claim it's not real relief.

19        THE COURT:  My thought would be to let them go first

20  and then let you respond.  Okay.  I am somewhat familiar

21  because, obviously, in the paperwork, it did include that.  But

22  I will give you the opportunity now to put some meat on the

23  bones, so to speak.

24        MR. OSTROW:  Understood.  Thank you for your time.

25        THE COURT:  Sure.  Let's have the bank go first.

1          MS. OAKLEY:  Thank you, Your Honor.

2      We agree with class counsel that there is significant

3  value to this settlement in the forms that he enumerated and

4  discussed and are before the Court in the papers, the

5  injunctive relief, cash component, debt relief.

6      I would like to offer just a couple of points of

7  clarification.  One goes to debt relief.  The other goes to the

8  effectiveness of the notice in this particular case.

9      With respect to the debt relief, the $29.1 million figure

10  was arrived at excluding getting credit for folks as to whom

11  the bank could not have pursued collection of those amounts in

12  any capacity.  Debts that the bank is aware had been discharged

13  through bankruptcy, for example, amounts that were not actually

14  collectible anymore are not included in the 29.1.  So it is not

15  illusory relief to people as to whom there could not have been

16  any recourse.  So that's not included in the 29.1 million.

17          THE COURT:  Okay.

18          MS. OAKLEY:  Class counsel also referred to a class

19  member being entitled to cash relief or debt relief.  Depending

20  on the circumstance of each class member, a class member could

21  receive both components of relief.  If they had paid an EOBC

22  out of pocket, they would be entitled to cash relief for that.

23  And separately, if thereafter their account had been closed,

24  with a different EOBC still pending, they would also get the

25  debt relief.  So people who fall into both camps get both forms

1    of relief.

2         The other clarification I want to make regards the

3    effectiveness of the notice.  As Epic's declaration set forth,

4    the anticipated deliverable rate is 93 percent.  I just want to

5    point out there were only -- of just shy of 7.1 million class

6    members, there were only six people to whom notice could not be

7    provided either by e-mail or mail, which I think is

8    extraordinary and worth pointing out.  I think the notice

9    protocol in this case was particularly strong.

10             THE COURT:  Very good.  Thank you.

11             MR. FRANK:  Thank you, Your Honor.

12        Our only objection to the settlement related to the

13   cy pres.  They did exactly what we asked.  They are going to

14   provide additional distributions to the class.  That resolves

15   the 23(e) objection, so all that's left is the dispute over

16   fees.

17        With respect to the percentage of the funds, we presented

18   evidence that the $1.2 billion figure was not an accurate

19   accounting of the benefit to the class because we presented

20   evidence that the decline in EOBCs would be offset by increased

21   fees elsewhere.  Nobody disputed that.  Nobody even responded

22   to that.  There's not actually a true benefit to the class with

23   respect to that.  The class will be paying higher fees

24   elsewhere.

25        That leaves the 29.1 million.  We are hearing now that

1  people who are bankrupt, people whose debts are not

2  collectible, are not included in the 29.1 million.  That does

3  address some of our concerns, but it does raise new concerns,

4  which is how are those people in the class being compensated?

5  If they are not eligible for the debt relief, maybe they are

6  getting cash relief.  But if they don't have an account and

7  their debts are uncollectible, are they getting any benefit, or

8  are they waiving their claims for nothing?

9      I did not hear about this until now.  It wasn't addressed

10  in Docket 105, the responses to the objections.  So that is an

11  interesting question.

12      We have no objection to a reasonable percentage of the

13  37.7 million.  We ask that the Court apply Ninth Circuit law

14  regarding cross-checks.  We have cited law.  They have cited

15  law.  I think our explanation is accurate.

16      They make a lot of personal attacks on me.  I don't need

17  to get into that unless the Court would like me to.

18      I will say that there's a substantial difference between

19  this case and *Eubank*, in that *Eubank* was a case that was fully

20  litigated by the objectors and won 100 percent of what they

21  were seeking; whereas here, this is a compromise, and therefore

22  the cross-check is much more important.  The class is

23  compromising its claims at ten cents on the dollar.  And we are

24  not saying that that's not fair, but at the same time, it is a

25  compromise, and therefore the avoidance of a windfall is much

16

1    more important.

2        And in *Eubank*, we documented the risk we undertook;

3    whereas, here, there is no documentation of the risk, and in

4    fact, the attorneys are including within their lodestar

5    hundreds of hours for cases that they lost, which is the

6    opposite of risk, because they are seeking to be paid for hours

7    where they lost a case.

8        I am happy to answer any questions the Court might have.

9           THE COURT:  I will wait until I hear the other side

10   and then I may have some.  Thank you very much.

11          MR. FRANK:  Thank you.

12       I apologize.  One more thing.

13       For the first time today, and in their reply brief -- they

14   did not raise it before the objection deadline -- they asked

15   for credit for the $3 million in notice and administration

16   fees.  It is within the Court's discretion to do that under

17   Ninth Circuit law.  That's the *Online DVD* case.

18       We would argue that it is inappropriate and the Court

19   should exercise its discretion not to do that.  And the case we

20   would cite for that proposition is *Redman v. Radio Shack*,

21   768 F.3d. 622.

22       Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. ZAVAREEI:  Good morning, Your Honor.  Hassan

25   Zavareei, on behalf of the class.

1      I am going to first respond to a couple of things that

2   Mr. Frank said, and then there are a couple of other arguments

3   I would like to make regarding his papers.

4      First, Mr. Frank argued that we presented -- I am sorry --

5   that he presented evidence that the 1.2 billion was illusory.

6   If you look at his brief, that evidence consisted of conjecture

7   that the bank could simply reinstate another fee and that

8   that's all the banks really do.  And he said we didn't respond

9   to that.  That's not true.  We did respond to that.  We pointed

10  to the settlement agreement that says that, "Beginning on or

11  before December 31, 2017, BANA agrees not to implement" -- it

12  says, "EOBCs or any equivalent fee for five years."

13     And, Your Honor, we are not babes in the woods, here, with

14  respect to banks and overdraft litigation.  We have litigated

15  against banks a number of times and a number of different

16  theories related to overdraft fees.  If they implement another

17  unlawful fee, we will be there, Your Honor, just as we were

18  when they engaged in overdraft fees for high-to-low reordering.

19     It is complete conjecture by Mr. Frank.  It is not

20  evidence.  And we did respond to that.  So the idea that

21  there's no value to the 1.2 billion has no merit.

22     Your Honor, Mr. Frank also said that he has no objection

23  to a percentage of the 37.5 million but that he believes that a

24  lodestar cross-check is appropriate.  Essentially, in his

25  papers, what he is trying to do, Your Honor, is completely

1  inconsistent with the arguments he made in his *Eubank* case.  We

2  attached his brief there.  And the law in this circuit is very

3  clear that a lodestar cross-check is discretionary.  There are

4  a number of factors that you need to look at, and a lodestar

5  cross-check is something the Court may look at.

6       But the appropriate analysis in the Ninth Circuit is to

7  start -- when you have a common fund of identifiable funds,

8  where the money can be readily quantified, you start with the

9  25 percent benchmark.  And there is no question here, Your

10  Honor, that the 3 million in notice and administration costs,

11  the 37.1 million in cash benefits, and the 29.1 million in debt

12  relief are readily quantifiable and are real benefits to the

13  class.

14       And 25 percent, Your Honor, of that number would amount to

15  over 17 million.  And we are seeking much less than that, Your

16  Honor.  We are seeking 14.5 million, which amounts to -- once

17  you add in the additional 1 million in notice and admin, it

18  adds up to 20.8 percent of the entire cash value to the class.

19       And Mr. Frank did mention the *In Re: Online DVD* case.  In

20  that case, he argued that the Ninth Circuit should adopt a new

21  rule and should not count those notice and admin costs.  The

22  Seventh Circuit has that rule, and the Ninth Circuit rejected

23  that and said it is appropriate to consider those, because

24  those are benefits to the class.

25       And again, we have done a lot of cases, set a lot of cases

1    with the bank.  This is a big case with a lot of class members.

2    It was very important to us that that money be included so that

3    the cost of notice and administration did not dilute the funds

4    that were available for the class members.

5        So, Your Honor, if I can, I want to talk for a minute,

6    before I go into the various factors, with respect to how you

7    adjust the 25 percent benchmark.  Before I do, I want to talk

8    about the lodestar and how that would play in here.

9        If the rule was, as Mr. Frank is advocating, that our fee

10   should be based predominantly on a lodestar multiplier, that

11   would create the exact wrong incentives in a case like this,

12   Your Honor.  This was a very important case, but I think, as my

13   co-counsel pointed out, this is one of -- I think Your Honor

14   was the only one to have the wisdom to get it right, in my

15   view; but in the views of a lot of other judges, we were wrong,

16   and there was a substantial risk that we could lose at the

17   Ninth Circuit, a risk that we believed that the defendant

18   valued at about what we settled this case for.  And the

19   predominant benefit to that was cessation of the practice and

20   the cash relief to the class.

21       If the rule was what Mr. Frank was arguing for, we

22   probably wouldn't have settled then, or at least there would

23   have been inappropriate pressure to drive up our lodestar.

24   That's what the Ninth Circuit talks about in the *Vizcaino* case,

25   where it says, "It is widely recognized that the lodestar

1    method creates incentives for counsel to expend more hours than

2    may be necessary."  So while this Court does have the

3    discretion to include that, Your Honor, I would suggest to you

4    that the way that the Court includes that is to determine

5    whether to and how far to depart from the benchmark.

6         So if we start at the benchmark, Your Honor, this Court

7    has identified a number of different factors that the Court

8    should look at, including the results achieved, the risk

9    involved in the litigation, the skill and quality of the work,

10   the contingent nature of the fee and the financial burden

11   carried by the plaintiffs and awards made in similar cases.

12        I am not going to belabor the benefits to the class.  I

13   think my co-counsel already spoke to this and I think the bank

14   spoke to this.  But again, we are talking about massive

15   injunctive relief with a readily quantifiable value.  This is

16   not hypothetical.  It is not a coupon.  It is not a new notice.

17   It is not a change in disclosures.  This is real money that

18   would come out of the pockets of class members and non-class

19   members.

20        And then there's the cash component; there's the 3 million

21   in notice and admin; and then there's the very significant debt

22   relief.

23        Your Honor, I know you raised a question about the debt

24   relief issue.  This is the second case in which I have been

25   able to obtain debt relief for my class clients.  In the other

1    case, which was in state court in Ohio, we were able to get a

2    significant amount of debt relief, very similar to this.  After

3    all the money was distributed and after the debt relief was

4    completed, we received a lot of positive feedback from the

5    class.

6         This is valuable because, Your Honor, once -- for a lot of

7    those people who have less than $35, their debt is going to be

8    completely closed out.  The bank is also obligated to notify

9    check systems that that debt has been paid off, and they are

10   going to do that for everybody.  That's another value to the

11   class.  Once they do that, Your Honor, these people can now go

12   open another bank account.

13        For the most part, if you have an outstanding balance with

14   your bank, it's virtually impossible to open a bank account.

15   You have got a lot of working poor, students, elderly, who have

16   small balances with the banks.  We are talking about 800,000

17   people, who it's almost impossible for them to open another

18   bank account, and this will allow them to do that.

19        So this idea that this debt relief does not confer

20   substantial, quantifiable value, Your Honor, I believe is

21   incorrect.  So that factor weighs heavily in favor of sticking

22   to the 25 percent benchmark or moving up.

23        Similarly, Your Honor, awards in similar cases.  We

24   presented in our brief a list of overdraft cases that involved

25   the high-to-low reordering, some of which we were involved in

1    and some of which we were not.  In those cases, the lowest

2    award that we have been able to find is 25 percent, and it goes

3    all the way up to 44 percent.  So, if you look at that factor,

4    which is clearly one of the factors in this Court, the

5    25 percent is low.

6         With respect to the risk and complexity of the case, Your

7    Honor, frankly, I think that the record of all the other cases

8    which we have set forth shows the real risk here.  Mr. Frank

9    argues there is no risk here because the case was weak and

10   cites to a quote that says that.

11        Your Honor, that's the opposite.  When the case is weak,

12   your risk is higher.  In his appellate argument, he said he

13   took on a lot of risks because he hardly ever gets awarded

14   fees.  But Your Honor, he gets a salary.  The Competitive

15   Enterprise Institute is not a contingency law firm, like our

16   firms are.  It is a nonprofit, aimed at objecting to certain

17   class settlements they find objectionable.  So that is not a

18   real risk.  What we are talking about is the people on this

19   team who risk their livelihoods, who risk everything that they

20   do in order to get benefits for the class.

21        And, Your Honor, another factor, the last factor, is the

22   skill and quality of the work.  Your Honor, I think when we

23   brought this case, we sort of had two teams converging here,

24   the Florida folks, from Mr. Hargrove, Ms. Pierson, Mr. Gowdy,

25   they had litigated the case in Florida that went up to the

1    Eleventh Circuit, and we teamed up with them.  We lost a

2    similar case against Bank of Oklahoma.  We thought, "Let's pool

3    our resources.  There is a lot of risk here.  Let's pool our

4    resources and see what we can do."

5        Bryan Gowdy is an accomplished appellate lawyer.

6    Mr. Ostrow and I have been litigating overdraft cases for

7    years.  Mr. Hargrove had been litigating class actions and

8    Ms. Pierson had been litigating class actions together for

9    decades.  So Your Honor, I would submit to you -- and you can

10   be the judge of the quality of our work and the quality of our

11   presentation, but I would submit to you, Your Honor, the skill

12   required and the quality of the work has been exceptional.

13       So where do we go with the lodestar cross-check?  Again,

14   the Ninth Circuit has cautioned that the cross-check is

15   entirely discretionary.  And what that means, Your Honor, is it

16   is just like any of these other factors.  You are free to look

17   at it.  And it is high, here, although, what I would say, Your

18   Honor, is currently it's -- as we submitted our papers, it is

19   8.8.  If you include the time through to today -- and we only

20   allotted one hour for this hearing -- it goes down to 8.1.

21       If there is an appeal, as there almost certainly will

22   be -- and the reason we will be is not necessarily because of

23   Mr. Frank's objection, but because of the objections of the

24   professional objectors.  They always appeal, Your Honor, and

25   then what they do is they ask for payment to dismiss their

 1   appeal.  So we are going to have to have an appeal in this

 2   case.  So that 8.1 multiplier is going to go down even lower.

 3        So, Your Honor, to the extent that the Court feels it is

 4   important to use a lodestar cross-check -- and again, we argue

 5   it is not necessary -- if the Court does so, we believe that a

 6   reduction of 4 percent or a little bit more than 4 percent is

 7   more than sufficient to account for the high lodestar

 8   multiplier.  Your Honor, the Ninth Circuit has made clear,

 9   class counsel should not be punished for getting a great result

10   early.  If that was the case and if that was the law, and

11   that's the law that Mr. Frank is advocating for, that would

12   have turned things on its head and create perverse incentives

13   for class counsel.

14        The Ninth Circuit has clearly made law on this issue.  We

15   are not supposed to start with lodestar.  It can be something

16   you look at, but it should not be dispositive, and our fee

17   should not be based on some sort of numerical analysis of what

18   our lodestar multiplier is.

19        Your Honor, that's all I have for my presentation, but if

20   you have any questions, I am happy to answer them now.

21        THE COURT:  That's fine.  Thank you.

22   I will hear from Mr. Frank if he wants to respond.

23        MR. FRANK:  Thank you, Your Honor.

24   First of all, *Pella* was not a Competitive Enterprise

25   Institute case.  It was not a nonprofit case.  It was done back

25

1   when I had a private practice outside of my nonprofit work.  So

2   I was not paid a salary for that case.

3         With respect to Ninth Circuit law, we are happy for you to

4   look at the cases and see that the Ninth Circuit does require a

5   cross-check.  For example, in *Bluetooth*, 654 F.3d. 935, it

6   talks about the importance of the cross-check to prevent

7   windfalls.  It is ironic because they accuse us of trying to

8   change the law, and here they are arguing public policy and

9   complaining that we are asking for an application of the law.

10  Maybe the law is wrong.  Maybe there would be a better law.

11  They are welcome to make that argument to the Ninth Circuit.

12        I am happy to answer any questions you might have.

13            THE COURT:  I don't really have -- I mean, I have

14  your briefs, which are pretty thorough.  There's really nothing

15  in -- you have covered some of the thoughts I had as to the

16  percentage-of-fund method and the lodestar.

17        And I will say that, as far as cross-checking, and I have

18  been debating.  I would have done some of that anyway.  But how

19  it comes out, to a certain degree, depends on other issues of

20  which you have both discussed and vary on as to how you really

21  treat the 29 million debt relief and some of the class who may

22  have already alleviated any form of payment through bankruptcy

23  or they just haven't paid.  Some of that gets buried.  So the

24  nuances of that have to be looked at, and I plan on doing that

25  further.  We have been already looking at it from the

1    standpoint of a cross-check.

2        My understanding of the law in California -- I will look

3    at the *Bluetooth* case.  My understanding is it's not required

4    under Ninth Circuit law.  But I will look again, on *Bluetooth*.

5        But from the standpoint of the nuances, you have pretty

6    well covered them.

7        Either way, I think that an amazing job has been done by

8    the parties.  The fact is that it took a lot of thought to

9    uphold this considering our review of the other non-published

10   decisions that have gone against us, and where I believe that

11   the plaintiff's position is the right one.  But the risk is

12   great -- there's no question -- as was pointed out.  There was

13   a great risk in this case because you never know what is going

14   to happen.

15       So I am going to look at it really closely.  I don't

16   really need anything further.  Because between what you have

17   said here today -- and I am going to get a transcript of

18   that -- and your filings, I think I have the viewpoint all the

19   way across the board.

20       The percentage-of-fund aspect of it, I have to say, in

21   further review, if the debt relief is to be treated exactly as

22   the class, the plaintiff's class, has analyzed it, then I think

23   that that would be the way to go.  If I look at it closer and I

24   see that the debt relief issues are a little more nuanced, that

25   might make a difference.  I can go that way, too.

1       But I have to say that there's been a great deal

2   accomplished for this class.  I mean, they are going to have --

3   the credit scores are going to be eliminated or at least

4   corrected based on the fact that the bank is going to take the

5   necessary steps to alleviate any credit reporting.  It allows

6   them to get different bank accounts at different banks which

7   would otherwise probably be precluded, along with a number of

8   the other aspects of it.

9       So that's really all I have to say at this point.

10      In closing, I would say if you have any quick thoughts you

11  want to add to this on either side, I am willing to listen

12  because I am going to get a copy of the transcript.  I think

13  it's important to see what your exact points are.  Sometimes

14  you get it clearer when you are verbally indicating it than you

15  do in papers.

16      MR. FRANK:  I wouldn't put too much weight on the

17  credit score, Your Honor.  If somebody owes the bank $300 and

18  that's on their credit report, and they are getting $30 debt

19  reduction that's reported to the credit agency, they are going

20  to owe the bank $270.  And that's going to be reported as

21  unpaid.  That might make a point or two difference in a FICO

22  score, but I don't even think it will make that much of a

23  difference.

24      THE COURT:  It's true.  It's interesting that you say

25  that.  That's not the position of class counsel, at least in

28

1    the papers.  It sounds to me like it's considered a plum, to a

2    certain degree.  And it seems like anything helps because once

3    you get a credit score that's down, that can be very

4    detrimental, particularly to people that are not particularly

5    affluent.

6         Anyway, that's my thoughts, but I will take a lot of time

7    to look at.  It took a lot of time to decide this to begin

8    with.  We will do that.

9              MR. FRANK:  Thank you, Your Honor.

10             THE COURT:  Anything else you want to add?

11             MR. OSTROW:  Just a couple of things, Your Honor.

12        We filed a declaration of Riaz Bhamani from Bank of

13   America, which is that declaration that I spoke of with respect

14   to the damages.  The debt relief portion is specifically

15   discussed in there, so you will be able to reinforce,

16   hopefully, your consensus that this is significant and real

17   relief, and it should be treated as equal as cash.

18        With respect to that, while you are considering that,

19   please don't forget that the cases that we have cited from

20   Professor Fitzpatrick, that he cited that we are relying on, as

21   well as a number of the overdraft cases that we had in MDL 2036

22   in the Southern District of Florida, they awarded cash on the

23   quantifiable injunctive relief.  So I am not -- and they are in

24   that brief, so don't take my word for it; read those opinions

25   if you would like.

1    They didn't award a full 25 or 35 percent, but I believe

2    there may have been 15 percent of the value of that injunctive

3    relief, they gave out of the cash settlement fund.  So that

4    should make you comfortable to the extent that you don't think

5    that a full 25 percent of that debt relief is appropriate, even

6    though we do believe it is.

7    Finally, I will just say that I want to thank you for your

8    time, for recognizing the risk that we took, for taking the

9    time that you spent at the initial stage to rule in favor of

10   the plaintiffs.  We believe it is the right ruling.  We haven't

11   been successful elsewhere, but we hope if this gets finally

12   approved, there will be other banks that want to follow suit

13   knowing that one of the giants did it and it is the right thing

14   for them to do as well.

15   So I finalize by saying we hope that you will issue a

16   final approval, that you will award the fees that we are

17   requesting, of 14.5 million, which is 21 percent of the

18   settlement value; that you appoint our plaintiffs as class

19   representatives, us as class counsel; that you deny the

20   objections; service awards of $5,000 each, except for the four

21   new participants, who will split the 5,000; reimbursement of

22   litigation costs and expenses of $53,119.92; and enter a final

23   judgment for us.  Thank you.

24        THE COURT:  Thank you very much.  You have been

25   actually very succinct in narrowing your issues in a very

1  cogent way.  With that, thank you, and we will be back with you

2  in a written order.  Okay.

3            ALL:  Thank you, Your Honor.

4       (End of proceedings at 11:50 a.m.)

5                        –o0o–

6            C–E–R–T–I–F–I–C–A–T–I–O–N

7

8            I hereby certify that I am a duly appointed,

9  qualified and acting official Court Reporter for the United

10 States District Court; that the foregoing is a true and correct

11 transcript of the proceedings had in the aforementioned cause;

12 that said transcript is a true and correct transcription of my

13 stenographic notes; and that the format used herein complies

14 with rules and requirements of the United States Judicial

15 Conference.

16            DATED:  June 22, 2018, at San Diego, California.

17

18                 /s/  Chari L. Bowery

19            _____
             Chari L. Bowery
20           CSR No. 9944, RPR, CRR

21

22

23

24

25