HASSAN A. ZAVAREEI (SBN 181547)
**TYCKO & ZAVAREEI LLP**
1828 L Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
*hzavareei@tzlegal.com*

*Counsel for Plaintiffs and Settlement Class (additional counsel listed on signature page)*

DANIELLE N. OAKLEY
**O'MELVENY & MYERS LLP**
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
(949) 823-7921
Fax: (949) 823-6994
Email: doakley@omm.com

*Counsel for Defendant (additional counsel listed on signature page)*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE FARRELL, RONALD ANTHONY DINKINS, LARICE ADDAMO, and TIA LITTLE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant. | CASE NO. 3:16-cv-00492-L-WVG<br><br>**PLAINTIFFS' AND DEFENDANT'S JOINT RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE**<br><br>Judge: Hon. M. James Lorenz |

# **TABLE OF CONTENTS**

I.    INTRODUCTION .......................................................................................1

II.   FACTUAL BACKGROUND ......................................................................4

III.  RESPONSES TO SPECIFIC ISSUES THE COURT IDENTIFIED ...................6

IV.  ARGUMENT ............................................................................................9

     A.    There Is No Conflict Among Class Members Because Each Class Member Incurred EOBCs and Will Be Compensated for All EOBCs Assessed. ..............................................................................10

     B.    There is No Conflict Because There Was and Is No Competition Between Class Members for Settlement Benefits...............................13

     C.    There Is No Conflict Among Class Members Because the Settlement Is an Excellent Result for the Class That "Fairly Compensates" All Class Members ..................................................................18

     D.    Courts Routinely Approve Similar Settlements Involving Both Cash Awards and Debt Relief Without Creating Subclasses or Appointing Separate Counsel. ...........................................................21

     E.    Practical Realities Also Favor Settlement. .................................22

     F.    Separate Class Counsel Is Not Necessary. ..................................23

V.   CONCLUSION .......................................................................................24

# **TABLE OF AUTHORITIES**

**Cases**

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997) ................................................................................. 11, 13

*Bostick v. Herbalife Int'l of Am., Inc.,*
  No. CV 13-2488 BRO (SHX), 2015 WL 12731932 (C.D. Cal. May 14, 2015) ............. 14

*Brown v. Transurban USA, Inc.,*
  318 F.R.D. 560 (E.D. Va. 2016) ........................................................................ 16

*Case v. French Quarter III LLC,*
  No. 9:12-cv-02804-DCN, 2015 WL 12851717 (D.S.C. July 27, 2015) ........................ 21

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974) ............................................................................. 20

*Corson v. Toyota Motor Sales U.S.A., Inc.,*
  No. 12-CV-8499-JGB (VBKx), 2016 WL 1375838 (C.D. Cal. Apr. 4, 2016) ......... 11, 16

*Cullen v. Whitman Med. Group,*
  197 F.R.D. 136 (E.D. Pa. 2000) ......................................................................... 21

*Desantis v. Snap-On Tools Co., LLC,*
  No. 06-cv-2231 (DMC), 2006 WL 3068584 (D.N.J Oct. 27, 2006) ............................ 21

*Dewey v. Volkswagen Aktiengesellschaft,*
  681 F.3d 170 (3d Cir. 2012) ............................................................................. 15

*Farrell v. OpenTable, Inc.,*
  No. C 11-1785 SI, 2012 WL 1379661 (N.D. Cal. Jan. 30, 2012) ......................... 11, 16

*Fleury v. Richemont N. Am., Inc.,*
  2008 WL 4680033 (N.D. Cal. Oct. 21, 2008) ...................................................... 17

*Fraley v. Batman,*
  638 F. App'x 594 (9th Cir. 2016) ...................................................................... 23

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ........................................................................... 20

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
  MDL No. 1917, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016) ................................ 12, 14

*In re Insurance Brokerage Antitrust Litig.,*
  579 F.3d 241 (3d Cir. 2009) .......................................................................... 18, 23

*In re Literary Works in Elec. Databases Copyright Litig.,*
  654 F.3d 242 (2d Cir. 2012) ............................................................................. 15

*In re Mego Fin. Corp. Sec. Litig.,*

213 F.3d 454 (9th Cir. 2000) ............................................................... 10, 16, 22

*In re Mfrs. Life Ins. Co. Premium Litig.,*
No. 1109, 96-CV-230 (BTM) (AJB), 1998 WL 1993385 (S.D. Cal. 1998) .............. 10, 16

*In re Nat'l Football League Players Concussion Injury Litig.,*
821 F.3d 410 (3d Cir.), *as amended* (May 2, 2016) ................................................ 12

*In re Oil Spill by Oil Rig Deepwater Horizon,*
910 F. Supp. 2d 891 (E.D. La. 2012) ............................................................... 23

*In re Online DVD-Rental Antitrust Litig.,*
779 F.3d 934 (9th Cir. 2015) ............................................................... 23

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,*
827 F.3d 223 (2d Cir. 2016) ............................................................... 12

*In re Target Corp. Customer Data Sec. Breach Litig.,*
--- F.3d ---, No. 15-3909, 2018 WL 2945973 (8th Cir. June 13, 2018) .................... 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,*
--- F.3d ---, No. 16-17157, 2018 WL 3340398 (9th Cir. July 9, 2018) .................... passim

*Messineo v. Ocwen Loan Servicing, LLC,*
No. 15-CV-02076-BLF, 2017 WL 733219 (N.D. Cal. Feb. 24, 2017) .................... 11, 16

*Moore v. PetSmart, Inc.,*
No. 16-16124, 2018 WL 1531060 (9th Cir. Mar. 29, 2018) ...................... 1, 7, 9, 14

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco,*
688 F.2d 615 (9th Cir. 1982) ............................................................... 20

*Ortiz v. Fibreboard Corp.,*
527 U.S. 815 (1999) ............................................................... 12, 15

*Pickett v. Iowa Beef Processors,*
209 F.3d 1276 (11th Cir. 2000) ............................................................... 15

*Purdie v. Ace Cash Express, Inc.,*
No. Civ.A 301CV1754L, 2003 WL 22976611 (N.D. Tex. Dec. 11, 2003) .................... 21

*Scaroni v. Target Corp. (In re Target Corp. Customer Data Sec. Breach Litig.),*
892 F.3d 968 (8th Cir. 2018) ............................................................... 23

*Schwartz v. Citibank (S. Dakota), N.A.,*
50 F. App'x 832 (9th Cir. 2002) ............................................................... 10, 13

*Staton v. Boeing Co.,*
327 F.3d 938 (9th Cir. (2003) ............................................................... 9

*Torrisi v. Tucson Elec. Power Co.,*
8 F.3d 1370 (9th Cir. 1993) ............................................................... 22

*Yokoyama v. Midland Nat. Life Ins. Co.,*
    594 F.3d 1087 (9th Cir. 2010) ............................................................................... 14

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................ 4

**Treatises**

3 Newberg on Class Actions (5th ed.) ............................................................... 1, 9, 22

PLANTIFFS' AND DEFENDANT'S JOINT RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG

# I.    INTRODUCTION

Plaintiffs and Defendant Bank of America, N.A. ("BANA") (collectively "the Parties") jointly submit this brief in response to the Court's Order to Show Cause [Dkt. No. 125 ("OSC")], in which the Court directed the Parties to file a memorandum "focus[ing] squarely on whether there are conflicting interests amongst subgroups of the class that require the creation of subclasses, potentially with separate representation." [*Id.* at 8.] A conflict of this type is uncommon and requires a "truly fundamental conflict of interest," 3 Newberg on Class Actions § 7.31 (5th ed.), and "there must be some actual, apparent conflict of interest beyond the mere unequal allocation of settlement funds." *Moore v. PetSmart, Inc.*, No. 16-16124, 2018 WL 1531060, at *2 (9th Cir. Mar. 29, 2018). No such conflict is present here.

The Court's concern appears to be driven by the possibility that settlement negotiations in this case were a "zero sum game," in which "a dollar spent towards Debt Portion relief is one less dollar BANA was willing to spend towards Cash Portion relief." [*Id.*] The Parties unequivocally inform the Court that this was not the case. Instead, the two numbers (cash and debt relief) were negotiated separately. Class Counsel[1] did not raise the issue of debt forgiveness for Class Members who had not paid extended overdrawn balance charges ("EOBC") until they believed they had obtained as much cash as BANA was willing to pay Class members who had paid EOBCs. Class Counsel never considered reducing the cash portion of the Settlement to increase the debt forgiveness portion—or vice versa. Nor did BANA. The final monetary relief terms were the result of the Parties accepting a mediator's proposal. Prior to the Parties' acceptance of that proposal, Class Counsel negotiated two separate methods of relief because, although BANA assessed at least one EOBC on every Class Member, some

---

[1] Capitalized terms are defined in this memorandum or have the same meanings as those found in the Settlement Agreement.

Class Members had paid the EOBCs, while others had not. Some paid one or more but not all EOBCs.  Thus, while the relief is tailored based on whether each Class Member paid the challenged EOBC, the underlying conduct for which each Class Member is being compensated is the same. Structuring a settlement in this way does not create a conflict of interest requiring separate subclasses or separate counsel.

In a published decision issued shortly after the OSC, the Ninth Circuit clarified that settlement relief tailored to the nature and extent of the harm incurred does not result in conflicts between class members. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, --- F.3d ---, No. 16-17157, 2018 WL 3340398, at *5-7 (9th Cir. July 9, 2018) [hereinafter "*In re Volkswagen*"]. *In re Volkswagen* concerned emissions "defeat devices" that Volkswagen ("VW") admitted installing in certain vehicles. *Id.* at *2. Plaintiffs who had purchased the defective vehicles faced disparate circumstances involving current or past ownership of vehicles, and the settlement relief was tailored to each: (a) individuals who still owned their vehicles ("Owners") had the option to sell the car back to VW or have it fixed, and would receive a cash payment of at least $15,000; and (b) individuals who had sold their vehicles after the scheme became public ("Sellers") would receive "'seller restitution' equal to one-half of full owner restitution." *Id.* at *2-3. The Ninth Circuit concluded the disparity between Owner compensation and Seller compensation did not create a conflict, or a need for subclasses, because "the seller restitution . . . was in an amount that generally fairly compensated" Sellers for their losses. *Id.* Indeed, the Sellers benefited from being in the same class with the Owners because the liability questions were the same for all class members. *See id.* Thus, subclasses and separate counsel were unnecessary.

The same is true in this case. Here, the liability questions were identical for all Class Members: whether the EOBCs assessed to Class Members during the Class Period were usurious interest charges under the National Bank Act ("NBA"). However, Class Members faced distinctive circumstances: (a) some paid EOBCs to BANA and suffered

money damages; (b) some failed to pay the EOBC and suffered indebtedness and ultimately had their checking accounts closed; and (c) some Class Members paid at least one EOBC *and* failed to pay at least one EOBC, suffering money damages and indebtedness. In addition to significant and valuable injunctive relief, the relief offered by the Settlement fairly and appropriately compensates all Class Members according to their circumstances. *See In re Volkswagen*, 2018 WL 3340398, at *7. It would not have been reasonable or fair for the Class Members who did not pay an EOBC to receive cash, further diluting the pro rata cash relief available to Class Members who actually paid their EOBCs. Nor would it be fair—or feasible—to provide debt relief to Class Members who paid the EOBCs. For Class Members who paid some EOBCs, but not all, the Settlement affords an appropriate combination of relief—a cash award and debt relief. These differences in the structure of compensation do not in any way raise conflicts of interest between Class Members. Rather, all Class Members' interests are aligned. They all want to get as much redress as possible for the allegedly unlawful EOBCs.  For Class Members who paid the fees, Class Counsel worked to maximize the cash portion of the settlement. For Class Members who did not pay fees, Class Counsel worked to maximize the debt forgiveness. As *In re Volkswagen* held, that the terms of the relief vary with Class Members' circumstances does not create a conflict of interest.

The fact that Class Members will receive both types of relief (cash for paid EOBCs and debt relief for a subsequent unpaid EOBC) in connection with approximately 358,531 accounts demonstrates that the types of relief do not create conflicting sub-groups. Instead, Class Members receive whichever type of relief suits their circumstances. That is no more of a conflict than what would exist between a Class Member who paid one EOBC versus another who paid five EOBCs. The latter Class Member will receive more cash as a result of a fair pro rata distribution, but that is not a conflict of interest. Courts have previously approved settlements such as this, where the type of relief is tailored to the injuries suffered, as in *In re Volkswagen*, without requiring

subclasses or separate counsel.  Thus, the Court should find that Plaintiffs and Class Counsel satisfy the "adequacy" prong of Federal Rule of Civil Procedure 23(a)(4).

## II.    FACTUAL BACKGROUND

On October 31, 2017, the Parties finalized the Settlement, and sought Preliminary Approval. [Dkt. #69-1, 69-2.] As the Preliminary Approval motion made clear, the most valuable relief to the millions in the Settlement Class is BANA's agreement to stop charging EOBCs for a period of five years. As noted in the Preliminary Approval motion and confirmed in later filings, that injunctive relief represents a $1.2 billion value. [Dkt. No. 69-1 at 22-23; Dkt. No. 69-3 ¶ 24; Dkt. No. 104-4 ¶ 8.] This was the first benefit discussed in the Preliminary Approval motion [Dkt. No. 69-1 at 10], and while the $66.6 million in direct monetary relief to the Class Members (in the form of cash and debt relief) is also a fantastic benefit for the Class, Class Counsel always viewed the injunctive relief as its crowning achievement in this lawsuit. [*E.g. id.* at 21 ("The cessation of the practice at the heart of Plaintiffs' Complaint is a massive benefit for the Settlement Class, and the additional $66.6 million recovery adds to the outstanding Settlement result.").]

In negotiating the Settlement, Class Counsel were aware of two key facts that affected the negotiation for monetary relief to the Settlement Class. First, only Class Members who were still BANA accountholders would benefit directly from the elimination of EOBCs. Zavareei Decl. ¶ 4. Second, while some Class Members actually paid EOBCs and thus should be compensated in the form of a cash recovery, other Class Members who were assessed an EOBC never paid it and, instead, their accounts were closed with debt owed in the form of unpaid EOBCs (and some Class Members had both). *Id.* Thus, because some Class Members with closed accounts had not actually paid EOBCs, cash relief would not be appropriate, and these class members would not benefit from the cessation of the EOBC practice.

Keeping those considerations in mind, Class Counsel set out to negotiate cash payments for Class Members who paid EOBCs (in addition to the benefit of the

cessation of EOBCs), and the following relief for Class Members with closed accounts: (a) debt relief *and* (b) a commitment by BANA to update any negative reporting to credit bureaus and/or Chex Systems, which would enable many Class Members who lost access to the banking system as a result of EOBC debt to open a checking account. Indeed, Class Counsel believed that negotiating monetary relief with cash payments to Class Members who never actually paid EOBCs would not fit their circumstances. *Id.* ¶ 6. Notably, Class Members associated with approximately 358,531 closed accounts and unpaid EOBC debt *also* paid prior EOBCs and, therefore, will be compensated with a cash payment *and* debt relief.

During settlement negotiations, the Parties never discussed or contemplated an "all-in, cash-plus-debt relief" amount. *Id.* ¶ 7. Rather, the Parties first negotiated the amount of cash BANA would make available to Class Members who paid EOBCs. *Id.* Only after Class Counsel believed that they had maximized that amount did Class Counsel introduce debt forgiveness relief for Class Members with unpaid EOBCs. *Id.* Although the Parties were near an agreement after separately discussing the two monetary relief components, the ultimate monetary relief to which the Parties assented was the result of a mediator's proposal. *Id.* ¶ 9. In short, the Parties reached separate compromises for the cash and debt relief components of the Settlement, after considering the most appropriate form of relief for each Class Member based on whether he or she had paid any of the EOBCs that had been assessed to each account. The negotiations never addressed the possibility of "an extra dollar in debt relief being added in exchange for a dollar in cash being subtracted," or vice versa. *Id.* ¶ 10. Nor did Class Counsel or BANA ever contemplate such an arrangement. *Neither Class Counsel nor BANA's counsel ever pitted Class Members against one another.*

Moreover, the Settlement was negotiated after the Ninth Circuit accepted a discretionary appeal of the Court's order denying BANA's Motion to Dismiss. *Id.* ¶ 11. The Ninth Circuit was poised to be the second federal appellate court to address

whether EOBCs could constitute interest under the NBA, with the Eleventh Circuit having previously ruled against plaintiffs. Class Counsel were fully aware of the Eleventh Circuit's decision and that every district court in the country—other than this Court—to have decided this issue ruled that extended overdraft charges are not interest under the NBA as a matter of law. Class Counsel negotiated the Settlement knowing that if this case did not settle before the appeal was decided, there was a very real possibility of an appellate loss and zero relief for all Class Members. *Id.* Thus, not only did Class Counsel negotiate the Settlement free from intra-class conflicts, Class Counsel did so in a way that maximized the relief available to all Class Members, accounting for any disparate circumstances, when the possibility of no relief whatsoever was fast approaching.

## III.    RESPONSES TO SPECIFIC ISSUES THE COURT IDENTIFIED

The Court posed five issues that it believes are "[e]specially germane" to resolving the adequacy question. [OSC at 8.] Many of those issues have already been discussed above and are discussed in greater depth below. But for the Court's convenience, the Parties provide the following short answers to address each issue:

- **Whether a dollar spent toward the Debt Portion relief is one less dollar BANA was willing to spend towards Cash Portion relief:** No. Class Counsel never considered reducing the cash portion of the settlement to increase the debt forgiveness portion and did not seek less cash remuneration in favor of greater debt relief. The cash portion of the settlement reflects the most cash remuneration BANA was willing to pay under the Settlement and was not impacted by the amount of the debt relief. The two numbers were negotiated separately in a step-by-step process intended to achieve maximum relief for all Class Members. Class Counsel did not raise the issue of debt forgiveness until they believed they had obtained as much cash as BANA was willing to pay.

- **Explanation of any disparate treatment amongst subgroups:** The Settlement is structured to compensate all Class Members according to their circumstances, an

approach consistent with 2018 Ninth Circuit precedent that post-dates the OSC. *See In re Volkswagen*, 2018 WL 3340398, at \*7. Class Members are treated consistently because each will be compensated based on the alleged harm incurred. Every Class Member who paid EOBCs will receive cash relief based on the number of EOBCs s/he paid. And every Class Member who still owes EOBC debt will receive debt relief. All Class Members who both paid EOBCs and have remaining EOBC debt will receive both forms of relief. Class Member awards differ based solely on the number of EOBCs each Class Member incurred and the number each Class Member actually paid. There is no disparate (*i.e.*, less favorable) treatment of any subgroup of Class Members. Nor is there unequal allocation of settlement funds. Rather, the Settlement fairly allocates the relief based on the type of injury suffered by each Class Member. This injury-based allocation of settlement funds does not create a conflict of interest between Class Members. *Moore*, 2018 WL 1531060, at \*2; *see also In re Volkswagen*, 2018 WL 3340398, at \*7.

- **Whether each subgroup has representation amongst the named plaintiffs:** Each Class Representative will receive cash relief. None is entitled to debt relief. The Parties submit that this is entirely appropriate because each named plaintiff—like every Class Member—incurred an EOBC. And each Class named plaintiff—like every Class Member—is receiving compensation based on the number of EOBCs each was assessed and the number of EOBCs each paid. Moreover, the Court's concern appears to be that the Class Members receiving debt relief are treated more favorably than those receiving cash. That the Class Representatives are all limited to cash relief should alleviate that concern because each Class Representative was positioned to vigorously advocate on behalf of the Class Members about which the Court appears to have concern.

- **The amount of EOBC-caused debt owed by the Debt Portion group and the number of class members that fall into the Debt Portion Group:** In the OSC, the

Court asked that the Parties tell the Court the total amount of EOBC debt owed by Class Members—which is the amount of debt relief that will be provided under the Settlement—and the number of Class Members who will receive debt relief.  As of December 15, 2017,[2] the amount of EOBC-caused debt owed by Class Members was $30,272,419.32. All outstanding EOBC debt owed by Class Members will be forgiven when the Settlement becomes Effective.[3] Subject to account-status changes that have occurred or will occur between Preliminary Approval and the date on which the Settlement becomes Effective, as of December 15, 2017, approximately 889,212 accounts were closed with at least some portion of an EOBC still pending, for which accountholders will receive debt relief. Of these, approximately 530,681 accounts will receive *debt relief only*. Approximately 358,531 accounts will receive *debt relief and a cash award*. BANA Decl. ¶¶ 3–4.

- **The sum of EOBC payments made by members of the Cash Portion group and the number of members that fall into the Cash Portion group:** The sum of EOBC payments paid by Class Members during the Class Period is $861,970,038.89. The total number of accounts in connection with which Class Members paid EOBCs during the Class Period is 6,587,163. *Id.* ¶4. Of these, 6,228,632 accounts belonging to Class Members are eligible for a *cash award only*. The remaining 358,531 accounts will receive *debt relief and a cash award. Id.* ¶¶ 3–4.

- **Whether there are any class members with unclosed accounts who were charged EOBCs during the class period and never paid them. If so, how many**

---

[2]  Under the Settlement, BANA was required to provide Class Member data to the Claims Administrator to facilitate class notices by December 26, 2017.  That data has been used to provide the information that the Court has requested.

[3]  The $29.1 million in debt relief discussed in the Settlement Agreement was based on earlier data.  Under the terms of the Settlement Agreement, all Class Members' remaining EOBC debt will be forgiven, even though the debt amount now exceeds $29.1 million.

**such class members there are and how much class period EOBC debt they owe:** No. Pursuant to the Settlement, BANA stopped assessing EOBCs in November 2017. BANA Decl. ¶ 6. Any Class Member who had an outstanding EOBC as of that time who did not cure his overdraft in full, including by paying the EOBC, would have had his account closed. This is because overdrawn accounts are closed automatically if the overdraft is not cured within 120 days. *Id.*. If any Class Members assessed an EOBC during the Class Period have not paid the EOBC, their accounts have been closed and they will be entitled to debt relief. If any Class Member assessed an EOBC during the Class Period paid the EOBC, that Class Member is eligible for a cash award.

## IV.   ARGUMENT

"'[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must *peruse the proposed compromise* to ratify both the propriety of the certification and the fairness of the settlement.'" *In re Volkswagen*, 2018 WL 3340398, at *5 (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. (2003)) (emphasis added). Subclassing is required only where there is a "truly fundamental conflict of interest," and when a court believes it will "materially improve the litigation."   3 Newberg on Class Actions § 7.31 (5th ed.). It is not required as a matter of course.

Courts across the country, including the Ninth Circuit, have held that "there must be some actual, apparent conflict of interest beyond the mere unequal allocation of settlement funds" for "a structural or fundamental[] conflict of interest requiring separate counsel" to exist. *E.g.*, *Moore*, 2018 WL 1531060, at *2. Further, shortly after the Court entered the OSC, on July 9, 2018, the Ninth Circuit issued a published opinion in *In re Volkswagen*, which discussed and significantly clarified the analysis courts should undertake in evaluating whether a potential conflict could exist between class members and class counsel. 2018 WL 3340398, at *6. In that decision, the Court provided the most common exemplars of cases in which named plaintiffs and their counsel might

have conflicting interests with unnamed class members: (i) where "two subgroups may have differing, even adversarial, interests in the allocation of limited settlement funds;" (ii) if "[c]lass members with higher-value claims may have interests in protecting those claims from class members with much weaker ones . . . or from being compromised by a class representative with lesser injuries who may settle more valuable claims cheaply;" and (iii) where agreements are "so unfair in their terms to one subset of class members that they cannot but be the product of inadequate representation of that subset." *Id.* at *6. As explained below, none of those exemplars of "fundamental," "structural" conflicts of interest are present here, obviating any need for subclasses and separate counsel representing each subclass.

### A. There Is No Conflict Among Class Members Because Each Class Member Incurred EOBCs and Will Be Compensated for All EOBCs Assessed.

There is no conflict among Class Members because their claims all stem from the same purported violation of the NBA—each Class Member was assessed at least one EOBC, which Plaintiffs allege were usurious interest under the NBA. And the Settlement compensates all Class Members for each EOBC assessed during the class period. Thus, there is no conflict among Class Members merely because the amount of the fees incurred or paid varied across the Class. *See Schwartz v. Citibank (S. Dakota), N.A.*, 50 F. App'x 832, 835 (9th Cir. 2002) (finding "no inherent conflict of interest between the named plaintiffs, all of whom actually suffered late fees or finance charges as a result of defendants' policies, and those class members who suffered no similar injury" because "[r]egardless of the potential differences in damages . . . all of their claims stem from" the same conduct and all plaintiffs "had a similar interest in obtaining relief from" the defendants' policy).

Here, as in other class settlements this Court has approved, relief will be "distributed to class members at the same times, based on the same methodology . . . for the same wrong." *In re Mfrs. Life Ins. Co. Premium Litig.*, No. 1109, 96-CV-230 (BTM)

(AJB), 1998 WL 1993385, at *3 (S.D. Cal. 1998). Moreover, this Settlement appropriately tailors relief to Class Members based on the nature of damages allegedly caused by BANA's EOBC policy. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (approving a settlement methodology where class members received different relief, including a large portion who received no monetary recovery); *Messineo v. Ocwen Loan Servicing, LLC*, No. 15-CV-02076-BLF, 2017 WL 733219, at *5 (N.D. Cal. Feb. 24, 2017) (granting final approval and finding "no known conflict of interest with proposed Class Members" where settlement provided account adjustment relief and/or a pro rata share of the settlement fund); *Corson v. Toyota Motor Sales U.S.A., Inc.*, No. 12-CV-8499-JGB (VBKx), 2016 WL 1375838, at *7 (C.D. Cal. Apr. 4, 2016) (granting final approval of settlement that "provides three different types of relief to Settlement Class members"); *Farrell v. OpenTable, Inc.*, No. C 11-1785 SI, 2012 WL 1379661, at *3 (N.D. Cal. Jan. 30, 2012) ("[T]he Ninth Circuit has held that it is permissible to award different relief to class members based upon objective differences in the positions of the class members."). Thus, there is no conflict.

This core similarity among all Class Members and the fact that each Class Member will be compensated for each EOBC assessed and/or paid readily sets this case and the Settlement apart from cases in which courts have identified conflicts requiring subclassing with separate counsel. *Cf. In re Volkswagen*, 2018 WL 3304398, at *6 (finding no conflict while noting that in some cases "subgroups may have differing, even adversarial interests in the allocation of limited settlement funds" or "[c]lass members with higher-value claims may have interests in protecting those claims from class members with much weaker ones"). For example, in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), cited in the OSC, the interests of class members were not aligned because the proposed settlement class included both class members who were presently suffering from injuries as a result of asbestos exposure, as well as individuals who had been exposed to asbestos but had not suffered any injury but could suffer injury in the

future. *See id.* at 624. "[F]or the currently injured, the critical goal [wa]s generous immediate repayments," a goal inconsistent with "the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future." *Id.* at 626. In contrast, here each Class Member suffered harm in the form of already-assessed EOBCs. The Class Members' interests are aligned because all seek to maximize the amount they will receive as compensation for each EOBC assessed during the Class Period. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 721680, at *15 (N.D. Cal. Jan. 28, 2016) ("[T]he representative plaintiffs' interests are directly aligned with those of the other members of the Class—the representative plaintiffs were damaged as a result of defendants' allegedly unlawful conduct, and the plaintiffs would have had to prove the same wrongdoing as the absent class members to establish liability."), *report and recommendation adopted in relevant part*, No. C-07-5944 JST, 2016 WL 3648478 (N.D. Cal. July 7, 2016). All Class Members share the common, present interest in maximizing redress for this harm, meaning that there is no conflict.

Since there is no need to account for the possibility of future harms that may yet develop, or vast disparities in the type or timing of injury, this case bears no resemblance to *Amchen* and its progeny, specifically cases like *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), *In re Payment Card Interchange Fee and Marchant Discount Antitrust Litigation*, 827 F.3d 223 (2d Cir. 2016), and *In re National Football League Players Concussion Injury Litigation*, 821 F.3d 410 (3d Cir.), *as amended* (May 2, 2016), in which subclasses were deemed necessary. In *Ortiz*, another asbestos case, the Court rejected the proposed settlement because, among other deficiencies, it failed to account for the interests of "holders of present and future claims" whose interests were not aligned. 527 U.S. at 856. Similarly, *In re Payment Card Interchange Fee* rejected a proposed settlement because of a fundamental conflict of interest between class members who had suffered past harm and would share in a fund of up to $7.25 billion in damages, and those who were facing potential future harm and were awarded *only* injunctive relief. Exacerbating the conflict was the fact that many

members of the injunctive relief-only group were unable to enjoy the benefits of the injunctive relief due to variances in state law, yet none of them was able to opt out of the settlement. *In re Payment Card Interchange Fee*, 827 F.3d at 233-34. *In re National Football League* likewise found that subclasses were needed because the settlement class included both retired football players currently suffering from injuries and others who had no present injury but might develop future injuries. 821 F.3d at 432-33.

Unlike each of these cases, each Class Member here holds a present claim against BANA based on its assessment of EOBCs. Additionally, Class Members who were dissatisfied with the Settlement had the option to opt out, and only 100 of over 7,000,000 Class Members exercised that right. The theory of liability is the same for each Class Member, and the Class's interest in maximizing compensation for BANA's past conduct is the same for each Class Member. As in *Schwartz*, "[t]he overarching goal of this litigation was to reimburse [Class Members] for . . . fees actually incurred as a result of the defendant['s] . . . policy, and to change that policy.  Each of the class plaintiffs, regardless of whether a monetary loss was suffered, had a similar interest in obtaining relief from the defendant['s] policy." 50 Fed. App'x at 835.

Each Class Member's claim turns on the same issue: whether the EOBC was a usurious interest charge under the NBA. And unlike the cases in which courts have identified fundamental conflicts, the Class here is a "discrete and identified class that has suffered a harm the extent of which has largely been ascertained." *In re Target Corp. Customer Data Sec. Breach Litig.*, --- F.3d ---, No. 15-3909, 2018 WL 2945973, at *2 (8th Cir. June 13, 2018). Thus, the conflicts identified in *Amchem, Ortiz, In re Payment Card Interchange Fee*, and *In re National Football League* simply do not exist.

### B.   There is No Conflict Because There Was and Is No Competition Between Class Members for Settlement Benefits.

There is also no conflict between Class Members because there was and is no competition between Class Members for Settlement benefits, eliminating the Court's potential concern of "disparate treatment" [OSC at 8] amongst Class Members. As

described above, during settlement negotiations, Class Counsel sought to and did maximize each form of relief for all Class Members separately, cash relief for Class Members who paid EOBCs and debt relief for those that did not. Zavareei Decl. ¶ 7. Only when Class Counsel believed they had obtained the maximum amount of cash relief possible for Class Members who paid EOBCs did they raise the issue of debt relief. *Id.* The amount of cash relief awarded to Class Members who are eligible for cash did not depend in any way, and was not restricted or reduced by, the amount of debt relief available to Class Members who are eligible for debt relief. *Id.* at ¶ 10. This was not a case in which the parties agreed upon a total dollar value and then allocated that sum amongst subgroups of class members, such that class members were competing for a limited pot of money. Accordingly, there is no conflict.

That different Class Members may receive different amounts of compensation does not alter this analysis. It is well settled in this Circuit that mere disparities in damages amounts do not necessitate subclasses and separate counsel because such disparities are not fundamental conflicts. *See, e.g.*, *In re Volkswagen*, 2018 WL 3340398, at *6-8 (finding no conflict between class members who received differing amounts of compensation); *Moore*, 2018 WL 1531060, at *2 ("To find that a conflict within a class is fundamental, and thus requires separate counsel, there must be some actual, apparent conflict *beyond the mere unequal allocation of settlement funds*.") (emphasis added); *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) (holding that "individualized issues" as to "damage calculations alone cannot defeat certification"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 721680, at *15 ("The mere fact that relief varie[s] among the different groups of class members [does] not demonstrate . . . conflicting or antagonistic interests within the class or adequacy of representation issues. Nor does the fact that the settlement fund allocates a larger percentage of the settlement to certain class members.") (citation and quotations omitted) (ellipsis in original); *Bostick v. Herbalife Int'l of Am., Inc.*, No. CV 13-2488 BRO (SHX), 2015 WL 12731932, at *13

(C.D. Cal. May 14, 2015) ("That differences exist with respect to the amount of products purchased by class members and the named plaintiffs (and therefore the value of relief to which each may be entitled) does not suggest a conflict of interest."). Moreover, Class Members will be compensated consistent with the number of EOBCs each Class Member was assessed, and the number of EOBCs each Class Member paid.

This Settlement, which maximizes the benefits available to all Class Members, cannot be fairly compared to settlements that pit class members against one another "in the allocation of limited settlement funds," or "are so unfair in their terms to one subset of class members that they cannot but be the product of inadequate representation of that subset." *In re Volkswagen*, 2018 WL 3340398, at *6. In *Ortiz*, for example, the Court found a conflict where the parties sought to allocate a single pot of money between class members whose claims were subject to indemnification by generous insurance policies and those whose claims could only be asserted against the financially unstable defendant. 527 U.S. at 857. Unsurprisingly, that conflict required subclasses of indemnified and non-indemnified claimants. *Id.* Conflicts may also be found where a settlement explicitly provides that if the settlement fund is insufficient to compensate all class members, some class members will see their compensation reduced or extinguished in order to ensure compensation for other class members. *See, e.g.*, *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir. 2012) (finding a structural conflict where one group within a single class had "priority access" to the fund, while another group could only seek compensation after the priority group's claims were satisfied); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2012) (finding a fundamental conflict of interest where class of plaintiffs was divided into three groups and "[i]f the total of all claims—plus the cost of notice, administration, and attorney's fees—exceeds $18 million, then the Settlement reduces compensation for Category C claims pro rata until the total compensation is $18 million," even if that meant that the Category C group received no compensation). A competition could also arise if some

1    class members benefitted from the practices that the plaintiffs sought to attack. *See, e.g.,*

2    *Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000) (reversing class cert where

3    class definition included cattle producers who claimed to have been harmed by contracts

4    and marketing agreements that benefited other class members).

5          None of the three conflicts discussed in the preceding paragraph is present here.

6    There was never a single pot of money to be allocated among Class Members; no Class

7    Member's reward will or would ever have been adjusted upward or downward based on

8    the amount awarded other Class Members. The absence of direct competition between

9    Class Members for relief fundamentally distinguishes this case from those in which

10   courts have found conflicts based on allocation of settlement benefits. And it goes

11   without saying that no Class Member ever benefitted from being assessed an EOBC.

12         Importantly, courts routinely approve settlements that tailor relief and

13   appropriately compensate class members according to their needs, so long as no class

14   members see their benefits reduced as a result—as is the case here. *See In re Volkswagen*,

15   2018 WL 3340398, at *7 (approving disparate compensation for current and former

16   vehicle owners and lessees that is "sensible" and "fully explicable"); *see also In re Mfrs. Life

17   Ins.*, 1998 WL 1993385, at *3 (approving "individualized" relief to be distributed to class

18   members at the same time based on the same methodology); *In re Mego Fin. Corp. Sec.

19   Litig.*, 213 F.3d at 461 (approving a settlement methodology where class members

20   received different relief, including a large portion who received no monetary recovery);

21   *OpenTable, Inc.*, 2012 WL 1379661, at *3 ("[T]he Ninth Circuit has held that it is

22   permissible to award different relief to class members based upon objective differences

23   in the positions of the class members."); *Messineo*, 2017 WL 733219, at *5 (granting final

24   approval and finding "no known conflict of interest with proposed Class Members"

25   where settlement provided account adjustment relief and/or a pro rata share of the

26   settlement fund); *Corson*, 2016 WL 1375838, at *7 (granting final approval of settlement

27   that "provides three different types of relief to Settlement Class members"); *Brown v.

28

-16-

*Transurban USA, Inc.*, 318 F.R.D. 560, 568 (E.D. Va. 2016) (granting final approval and finding "nothing indicates the existence of subgroups that might require the creation of subclasses" where settlement created separate funds for class members based on the amount of fees/penalties paid). For example, in *In re Volkswagen*, in addition to the challenged restitutionary payments described above, the district court also approved a settlement provision that allowed current vehicle owners to choose between participating in a buyback program or having their vehicles fixed.[4] *See In re Volkswagen*, 2016 WL 6248426, at *4. The buyback program awarded an extra 30% compensation for class members who chose to participate but would still owe more money to their lender on their vehicles than the buyback provided. *Id.* at *21. The district court recognized that the loan forgiveness provided "additional benefits" to some class members. *Id.* Yet this difference did not create a conflict because it "d[id] not reduce the benefits of other Class Members." *Id.* Moreover, each of these Class Members ultimately obtained "the same benefit" because they could return their vehicles and be relieved of the "financial obligations associated with ownership." *Id.*

Similarly, here, while Class Members receiving debt forgiveness may technically receive something "more," that difference does not create a conflict because the amount of debt relief awarded to some Class Members does not reduce the cash benefits available to Class Members eligible for cash. *See id.*; *see also Fleury v. Richemont N. Am., Inc.*, 2008 WL 4680033, at *4-5 (N.D. Cal. Oct. 21, 2008) (refusing to require separate counsel even though "the benefits for the consumers are different from the benefits for the watchmakers," because funds were not "diverted from the watchmaker subclass to the consumer subclass" and there was "nothing to indicate that the settlement terms of one subclass came at the expense of the other"). Ultimately, each Class Member will receive

---

[4] In affirming the settlement approval, the Ninth Circuit did not mention this particular relief provision, but it was apparently not a concern.

the same benefit: compensation for the EOBC(s) and relief from the financial obligations associated with them.

The fact that 358,531 accounts held by Class Members will receive both debt relief and a cash award further confirms that there is no competition between Class Members for the same pot of money. *See, e.g., In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009) (recognizing that where many class members will receive more than one type of relief, "the Plan of Allocation did not create de facto subclasses among the class members, but merely created a structure for ensuring that reimbursement is tied to the extent of damages incurred on certain policies of insurance"). On the contrary, the Settlement creates a structure to ensure that reimbursement is tied to those who paid, and debt forgiveness is available to those in debt.

In sum, the Class Members here were never in competition with one another for settlement benefits, and the structure of the Settlement, which fairly compensates Class Members according to their needs without creating disparate treatment, is completely consistent with the Ninth Circuit's mandate in *In re Volkswagen*.

## C. There Is No Conflict Among Class Members Because the Settlement Is an Excellent Result for the Class That "Fairly Compensates" All Class Members

The Court should consider the adequacy concern in light of the excellent result the Settlement provides for the Settlement Class. In addition to significant and valuable injunctive relief that benefits every Class Member who has a BANA checking account, the Settlement fairly compensates all Class Members. Indeed, the Court itself has recognized that "there's been a great deal accomplished for this class," particularly in light of the "great risk in this case." Transcript of Final Approval Hearing ("Tr.") at 26-27 (June 18, 2018), Dkt. No. 125. Thus, far from creating conflicts, the Settlement represents a fantastic outcome for the Class that fairly compensates millions of consumers nationwide.

*In re Volkswagen* makes clear that when evaluating whether there are conflicts

among class members, the Court can and should consider whether the settlement "generally fairly compensates" all class members for their losses—as the Settlement here clearly does. In that case, one reason the Ninth Circuit approved the settlement over the objections of a few was the court's conclusion that the settlement "generally fairly compensated" all class members for their losses, and, indeed, the sellers benefited from being in the same class with the owners. 2018 WL 3340398, at *3. This was true even where the Settlement explicitly entitled sellers to less money than owners because, like here, although owners and sellers were subject to the same conduct by the defendant, they had different needs and were compensated accordingly.

Here, not only are Class Members being generally fairly compensated, but they are receiving an outstanding recovery achieved against bad odds. Based on the questions raised in the OSC, the Court seems primarily concerned with the per-EOBC cash payment for Class Members who paid EOBCs and are not receiving debt relief. [OSC at 7.] While those Class Members will not receive a repayment of 100% of their paid EOBCs, Class Counsel secured the highest possible cash settlement amount on behalf of the Settlement Class. The Settlement Class's best-case damages would have been 100% of the EOBCs they paid. No settlement would have been reached on terms even close to best-case damages, particularly given that the core legal question at issue in this case was poised for appellate decision, and every other case asserting the same issue had been dismissed with prejudice. Moreover, approximately 3,186,097 BANA accounts belonging to Class Members remain open and thus will benefit from the elimination of EOBCs on a going-forward basis. *See* BANA Decl. ¶ 5.  In light of the challenges of this case, this is fair compensation.

Once Class Counsel had maximized cash BANA would have been willing to pay to Class Members who paid EOBCs, the options were limited for addressing the risk of *overcompensation* through debt relief for Class Members who had not paid EOBCs.  Those options would have remained the same whether the same Class Counsel sought the debt

relief or whether separate class counsel did so for on behalf of those in need of debt relief.  The only ways to address the Court's concerns do not make things better for the Class Members who are receiving cash—they would just make it worse for the Class Members receiving debt relief. For instance, the Settlement could reduce the debt relief, or eliminate it altogether and let the debt relief class members share in the cash recovery based on EOBCs that were never paid. This would make less cash available to Class Members who paid EOBCs and would be less advantageous for the class members who would otherwise receive full debt relief. Another alternative, which is not palatable to BANA, and assuredly not palatable to the approximate 889,000 former account holders (poised to receive debt relief) who did not object, would be to amend the Class definition to eliminate the Class Members who did not pay EOBCs.  Doing so would leave those Class Members exposed to liability to BANA and still subject to harm to their credit, and BANA exposed to the risk of additional litigation.   Moreover, eliminating Class Members who did not pay EOBCs from the Class would not benefit the Class Members who paid the EOBCs by increasing their cash recovery, because eliminating debt relief would not result in additional cash being made available to the Class.

Courts have long recognized that Class Members need not be treated in precisely the same way to avoid a conflict of interest.  Ultimately, in evaluating a proposed class settlement, "the district court's determination is nothing more than 'an amalgam of delicate balancing, gross approximations and rough justice.'" *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974)). Indeed, the question "is not whether the final product could be prettier, smarter, or snazzier, but whether it is fair, adequate, and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). The Settlement here meets those requisites and does not create a conflict between Class Members.  "Perusing the settlement before [the Court, it] should see no indication

of an "irreparable conflict of interest, either in the structure of the class or the terms of the settlement, that prevented the named class representatives [in the cash relief subgroup] from adequately representing [the debt relief subgroup], or prohibited the commingling of the two in a single class." *In re Volkswagen*, 2018 WL 3340398, at *6 (citing *Hanlon*, 150 F.3d at 1021).

### D. Courts Routinely Approve Similar Settlements Involving Both Cash Awards and Debt Relief Without Creating Subclasses or Appointing Separate Counsel.

The conclusion that there is no conflict here finds additional support in the numerous cases approving similar settlements involving both cash awards and debt relief without creating subclasses or appointing separate counsel. *See, e.g.*, *In re Volkswagen*, 2016 WL 6248426, at *21; *Case v. French Quarter III LLC*, No. 9:12-cv-02804-DCN, 2015 WL 12851717, at *2 (D.S.C. July 27, 2015) (approving settlement providing class members with $4.1 million in cash, as well as $4.2 million in debt forgiveness); *Purdie v. Ace Cash Express, Inc.*, No. Civ.A 301CV1754L, 2003 WL 22976611 (N.D. Tex. Dec. 11, 2003) (approving cash and debt relief settlement that provided for debt relief in greater absolute value than the cash amount); *Cullen v. Whitman Med. Group*, 197 F.R.D. 136 (E.D. Pa. 2000) (approving settlement of $5.97 million in cash and $1.3 million in loan forgiveness). Courts have also approved settlements where there was not a class representative receiving every type of relief awarded. For example, in *Desantis v. Snap-On Tools Co., LLC*, No. 06-cv-2231 (DMC), 2006 WL 3068584, at *2-3 (D.N.J Oct. 27, 2006), the court approved a settlement providing two sets of benefits to (i) former franchisees and (ii) current and prospective franchisees even though all class members were former franchisees. These cases make clear that class settlements awarding cash benefits to some class members and loan forgiveness to others are fair, reasonable, and ordinary, and do not create fundamental intra-class conflicts.

The Settlement bears significant similarities to the settlements in these cases. For example, in *Purdie*, the court approved a settlement that provided approximately 414,000

class members with cash amounts of between $7.50 and $45.00 as reimbursement for loans already paid, and provided $52 million in debt relief to 192,582 class members who would see their unpaid loans erased in their entirety (resulting in an average debt relief of $270 per eligible class member). 2003 WL 22976611, at *7. The court found that, far from penalizing class members who had paid their loans, the settlement was "fair, reasonable and adequate to the members of the Class," and indeed that it provided "excellent benefits" to class members. *Id.* at *4, *8. Similarly, this Court recognizes that the Settlement confers substantial benefits on everyone in the Class. Tr. at 26-27; *see also* Dkt. No. 72 at 1. No class member is being penalized; rather, every Class Member is receiving fair and reasonable compensation for his or her injury.

### E. Practical Realities Also Favor Settlement.

The Court can and should also consider two practical realities: (1) Class Members who feel their rights are not vindicated had the right to opt out (only 100 did so), and (2) if the Court refuses to certify the Settlement Class, it is possible that the Parties would not reach another settlement and, given the risks associated with the litigation, no one could recover anything. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 463 (concluding that the finding that there was no conflict between class members who would receive compensation and those would receive no compensation was strengthened by the availability of an opt-out procedure and the fact that "were we to decertify the current class it is possible that no one will recover anything . . . The present settlement at least allows damages for some members of the class where damages might otherwise be unobtainable for any member of the class"). In addition, of the over 7,000,000 Class Members, only eleven objected. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1378 (9th Cir. 1993) ("[N]otice of the settlement was given to 113,000 class members. Only twenty objections were filed. Only [two objectors] have appealed, and even they have not opted out. These circumstances suggest that the appellants are spoilers.").

### F.    Separate Class Counsel Is Not Necessary.

As explained above, there is no fundamental conflict amongst Class Members that would warrant separate class counsel for those Class Members receiving debt relief and those receiving cash. According to Newberg, "[i]n general, class counsel may represent multiple sets of litigants—whether in the same action or in a related proceeding—so long as the litigants' interests are not inherently opposed." Newberg on Class Actions § 7:32 (5th ed.). Newberg notes that concurrent representation may be beneficial in some situations, and that courts have found counsel inadequate due to conflicts where "the recovery of one group in one forum inherently conflicts with the recovery of the other," which is not the case here. *See Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1047 (N.D. Cal. 2014) (alterations in original) (quoting Newberg on Class Actions § 3:75 (5th ed.)); *Scaroni v. Target Corp. (In re Target Corp. Customer Data Sec. Breach Litig.)*, 892 F.3d 968 (8th Cir. 2018) (finding that separate class counsel is not necessary when the interests of two groups are more congruent than disparate).

Here, Class Members' interests are congruent. Each Class Member holds a present claim against BANA based on its practice of assessing EOBCs, with the only material difference being whether the Class Member paid some or all of the EOBC(s), or failed to do so and had his or her account closed while still owing money to BANA.  Because the Class Members' interests are not divergent, separate counsel is not required. *Fraley v. Batman*, 638 F. App'x 594, 598 (9th Cir. 2016) (affirming district court's decision declining to appoint separate settlement class counsel to represent different subclasses because there was no structural conflict of interest between the subclasses) (citing *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942-43 (9th Cir. 2015)); *accord In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 916 (E.D. La. 2012) ("[S]eparate representation for all possible interests is not necessary where the class members' interests are not actually divergent." (citing *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009)).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# V.    CONCLUSION

Based on the above arguments, and those made in the Motion for Final Approval, the Parties respectfully submit that the adequacy requirement of the class certification standard has been met, and this Court should grant Final Approval of the proposed Settlement.

Dated: July 30, 2018                                    Respectfully submitted,


/s/Danielle N. Oakley                              /s/ Hassan A. Zavareei
DANIELLE N. OAKLEY (SBN 246295)         HASSAN A. ZAVAREEI (SBN 181547)
**O'MELVENY & MYERS LLP**                   **TYCKO & ZAVAREEI LLP**
610 Newport Center Drive                         1828 L Street, NW, Suite 1000
17th Floor                                               Washington, DC 20036
Newport Beach, CA 92660                          Telephone: (202) 973-0900
(949) 823-7921                                        Facsimile: (202) 973-0950
Fax: (949) 823-6994                                 *hzavareei@tzlegal.com*
Email: doakley@omm.com


MATTHEW WILLIAM CLOSE               JEFF OSTROW (*pro hac vice*)
**O'MELVENY & MYERS LLP**             **KOPELOWITZ OSTROW**
400 South Hope Street                      **FERGUSON WEISELBERG**
Suite 1050                                        **GILBERT**
Los Angeles, CA 90071-2899               One West Las Olas Blvd., Suite 500
213-430-6000                                   Fort Lauderdale, FL 33301
Fax: 213-430-6407                            Telephone: (954) 525-4100
Email: mclose@omm.com                    Facsimile: (954) 525-4300
                                                     *ostrow@kolawyers.com*


BRIAN D. BOYLE                             BRYAN GOWDY (*pro hac vice*)
JONATHAN HACKER                         **CREED AND GOWDY, P.A.**
**O'MELVENY & MYERS LLP**             865 May Street
1625 Eye Street, NW                         Jacksonville, FL 32204
Washington, DC 20006-4001              Telephone: 904-350-0075
(202)383-5300                                 Facsimile: 904-503-0441
Fax: (202)383-5414                           *bgowdy@appellate-firm.com*
Email: bboyle@omm.com
Email: jhacker@omm.com

*Counsel for Defendant*

JOHN JOSEPH UUSTAL (*pro hac vice*)
CRISTINA M. PIERSON (*pro hac vice*)
JOHN R. HARGROVE (*pro hac vice*)
**KELLEY UUSTAL PC**
500 North Federal Highway, Suite 200
Fort Lauderdale, FL 33301
Telephone: 954-522-6601
*jju@kulaw.com*
*cmp@kulaw.com*
*jhr@hargrovelawgroup.com*

WALTER W. NOSS (CA 277580)
**SCOTT + SCOTT LLP**
707 Broadway,10th Floor
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
*wnoss@scott-scott.com*

*Class Counsel*

PLANTIFFS' AND DEFENDANT'S JOINT RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG