Michael D. Luppi
California Bar Number-55865
Law Office of Michael D. Luppi
11366 Christy Ave.
Sylmar  CA  91342
Phone Number: (818) 897-3344
Fax Number: (323) 726-3106
luppiacct@gmail.com
*Attorney for Objector Estefania Osorio Sanchez*
*a/k/a Stephanie Osorio*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE FARRELL, RONALD ANTHONY DINKINS, LARICE ADDAMO, and TIA LITTLE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BANK OF AMERICA. N.A.,<br><br>Defendant. | CASE NO. 3:16-cv-00492-L-WVG<br><br>**OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE (DOC 125)**<br><br>Judge: Hon. M. James Lorenz |

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

RESPONSES TO THE FIVE SPECIFIC ISSUES IDENTIFIED BY THIS COURT ( Doc 125, Page 8)

**I  Whether a dollar spent towards Debt Portion relief is one less dollar BoA was willing to spend towards Cash Portion relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**II  Explanation of any disparate treatment amongst subgroups** . . . . . . . . . . . . . . . . . . . . . . . 7

**III  Whether each subgroup has representation amongst the named plaintiffs** . . . . . . . . . 10

**IV  The amount of EOBC caused debt owed by the Debt Portion group and the number of class members that fall into the Debt Portion group.  The sum of EOBC payments made by members of the Cash Portion group and the number of members that fall into the Cash Portion group** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**

**V  Whether there are any class members with unclosed accounts who were charged EOBCs during the class period and never paid them.  If so, how many such class members there are and how much class period EOBC debt they owe** . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG

# TABLE OF AUTHORITIES

## CASES

*Anchem Prods., Incorporated v. Windsor,* 521 U.S. 591, 117 S Ct. 2231, 138 L. Ed. 2d 689 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Case v. French Quarter III LLC* USDC DSC Case No. 9:12-cv-02518 . . . . . . . . . . . . . . . . 10

*Cullen v. Whitman Med. Group,* 197 F.R.D. 136 (E.D. Pa. 2000) . . . . . . . . . 13, 14

*Deiter v. Microsoft Corp.,* 436 F.3d 461 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . 10

*Desantis v. Snap-On Tools Co., LLC*, Civil Action No. 06-cv-2231 (DMC), 2006 U.S. Dist. LEXIS 78362 (D.N.J. Oct. 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*General Tel. Company of the Southwestern v. Falcon,* 457 U.S. 147 (1982) . . . . 10

*Lewis v. Casey*, 518 U.S. 343, 358 n. 6, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) . . . . . . . . . 2

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 Southern Ct. 2130, 119 L. Ed. 2d 351 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Ogden v. Bumble Bee Foods, LLC, Case Number C-12-1828 LHK,* 292 F.R.D. 620 (N.D. Cal. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Purdie v. Ace Cash Express, Inc.*, Case 3:01-cv-01754 USDC NDTX   . . . . . . . . . . . . . . . . 12

*Redman v. Radio Shack Corp.,* 768 F.3d 622 (7th Cir. 2014) . . . . . . . . . . . . . . . . 9

*Sosna v. Iowa,* 419 U.S. 393, 95 Southern Ct. 553, 42 L. Ed. 2d 532 (1975) . . . . . 1

*Staton v. Boeing Company,* 327 F.3d 938 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 (3d Cir. 2004) . . . . . . . . . 14

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG
iii

# INTRODUCTION

One of the many tasks for a Court, when it is considering approval of a proposed class action settlement, is to ensure that the proposed settlement "protects unnamed class members 'from unjust or unfair settlements affecting their rights' " *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997).

For purposes of legal analysis, before one can reach the unique numerosity, commonality, and typicality questions requirement of F.R.Civ.P. 23(a), a court must consider the underlying issue of the case or controversy requirement of Article III of the Constitution; i.e., Article III requires a plaintiff to show they have standing to raise the claim. The Supreme Court has said that: (1) the party invoking federal jurisdiction must have suffered an actual or threatened injury; (2) the injury must be fairly traceable to the defendant's challenged conduct and; and, (3) the injury must be redressable. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). In the class action context, the standing question becomes the question of whether a named plaintiff can represent potential class members whose injury is not congruent with the injury to the named plaintiff. In answering the question some courts have chosen a standing analysis, while others have chosen to use a typicality and adequacy of representation analysis. *Ogden v. Bumble Bee Foods, LLC*, Case No. C-12-1828 LHK, 292 F.R.D. 620, 623 (N.D. Cal. 2013).

Unfortunately, the decisions of the Supreme Court do not provide an answer. On one hand the Court has found that the issue is resolved by a Rule 23(a) analysis. *Sosna v. Iowa*, 419

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG
1

U.S. 393, 402-03, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975) ("A named plaintiff in a class action must show that the threat of injury in a case such as this is 'real and immediate,' not 'conjectural' or 'hypothetical.' . . . This conclusion does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interests of the class' [under] Rule 23(a)").

On the other hand, the Court held that there was standing as to only the specific type of injury suffered by one of the named plaintiffs and therefore, that the injunction entered by the lower court was improper to the extent it was intended to remediate other injuries allegedly suffered by class members; stating: "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n. 6, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996).

If the Court views this matter from a standing perspective, then the Named Plaintiffs do not have standing to plead a cause of action that encompasses the Debt Relief subgroup, i.e., the named plaintiffs could not, as part of the settlement process file an amended complaint that encompasses a count for damage to the Debt Relief subgroup.

If the Court views this matter from a typicality perspective, then the Named Plaintiffs lack Rule 23(a)(3) typicality.  None of the named plaintiffs had their bank accounts closed by the Defendant, which also reported the closed and delinquent account information to a credit bureau.

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG
2

**I**

**WHETHER A DOLLAR SPENT TOWARDS DEBT PORTION RELIEF IS ONE LESS DOLLAR BOA WAS WILLING TO SPEND TOWARDS CASH PORTION RELIEF.**

The Joint Response tells the Court that strategically, through mediation, Class Counsel negotiated the Cash Portion Relief first. After extracting the maximum benefit, they then negotiated for the Debt Relief Subgroup.

The question then becomes: whether had there been a lawyer with a Debt Relief subgroup client at the table, is it likely that the negotiations would have mirrored the reality in this matter. Clearly not. Instead, a class counsel representing the Debt Reduction subgroup would not have allowed the subgroup to be settled as an afterthought. Instead, they would have addressed the question of whether BOA would setoff the entire debt regarding the closed account.

The chronology of the negotiations are central to answering the Court question posed. From the Joint Response, it is clear that all of the actual cash was earmarked for the Cash Payment subgroup and that quantifying the value for the Debt Relief Group portion of the purposed settlement is speculative at best. However, whatever value the Court assigns to the Debt Reduction subgroup portion of the purposed settlement; that vale is no where near $29.1 million. Additionally, prior to any approval of the proposed settlement the Court need to be informed of the monetary value of the upgraded credit reports that are part of the Debt Reduction subgroup's porttion of the proposed settlement.

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG
3

As the proposed settlement is currently structured, the question, which implies a *quid pro quo* of cash or it's equivalent between the two (2) subgroups  is not really possible to answer. The question implies that Bank of America (BOA), is paying cash out of pocket to both subgroups, when, in reality, it is not.

Each and every Debt Reduction subgroup member became a subgroup member when - for whatever reason - their BOA checking account became overdrawn. BOA then paid the overdraft for the Debt Reduction subgroup member, while simultaneously, BOA charged the Debt Reduction subgroup member a $35 fee for paying the over drafted amount. Then, after seven days, when the Debt Reduction subgroup member couldn't repay BOA the over drafted amount plus the $35 overdraft fee BOA charged the Debt Reduction subgroup member an additional $35 Extended Overdrawn Balance Charge ("EOBC"). When the Debt Reduction subgroup member was then unable to pay BOA the original overdraft amount plus the $70 in bank charges, BOA, after 120 days, closed the Debt Reduction subgroup member's account and reported their delinquent account to a credit bureau.

Nothing in any of the paperwork filed in this matter would lead anyone to believe that BOA has made, or is making, any effort to collect the money owed from the Debt Reduction subgroup. And, perhaps a better question is whether or not BOA his written off the Debt Reduction subgroup's debt.

But in any event, it costs BOA little or nothing to reduce each Debt Reduction subgroup members debt by a maximum $35 bookkeeping entry. Obviously, to accomplish the necessary

bookkeeping entry and report the new status of the former customer's account to a credit bureau will cost something; just not $35, or anything close, per subgroup member. More importantly, the final cost to BOA, of making the required bookkeeping entries and notifying a credit bureau of the account status, will not be even a significant fraction of $29.1 million. Before possibly approving the purposed settlement; this Court should direct BOA to inform it of the projected cost of compliance with the Debt Reduction portion of the proposed settlement.

The forgoing is fully supported by the language of the settlement agreement regarding debt reduction, which states on page 5 at subsection 2.2 (2) (4): "Debt Reduction Payments. For Class Members who were assessed an EOBC during the Class Period, and whose accounts were closed while an EOBC was still due and owing, the Debt Reduction Amount will be used by BANA to make Debt Reduction Payments toward the outstanding balance on the account that was closed with the EOBC still due and owing in an amount up to $35 to reflect a credit for the outstanding EOBC. If the outstanding balance exceeds $35, the Debt Reduction Payment will be $35. If the outstanding balance is less than $35, the account balance will be adjusted to zero dollars. Under no circumstances will BANA be required to make any cash payments as a result of the Debt Reduction or make Debt Reduction Payments exceeding the Debt Reduction Amount. To the extent BANA has reported the accounts to any credit bureaus, BANA will update the reporting.

In the event the Debt Reduction Payment brings the account balance to zero, the reporting will be updated to state that the account was paid in full. In the event the Debt Reduction

Payment does not bring the account balance to zero, the reporting will be updated only to state that a partial payment has been made on the account. No Debt Reduction Payment shall be considered an admission by any Class Member that the underlying debt is valid."

All in all, had a typical Debt Reduction subgroup members attorney negotiated a more tangible benefit - for example: a 50/50 cash payment and debt reduction - then both sub groups would have proportionally benefitted. And a portion of the fees, incentive awards and administrative cost could have been paid by the Debt Reduction subgroup. However, as things stand the Debt Reduction subgroup has no cash with which to pay anything.

## II

## EXPLANATION OF ANY DISPARATE TREATMENT AMONGST SUBGROUPS

The disparate treatment between the subgroup arises out of the fact that only the Cash Payment subgroup will be paying all of attorneys' fee, incentive awards and the costs of administration. The Debt Reduction subgroup (which has no cash) will be paying nothing toward attorneys' fee, incentive awards, and the costs of administration.

As the settlement is structured, there is a $37.5 million common fund. However, that common fund is only funded by the Cash Portion of the settlement (hereinafter, for clarity, the Cash Payment Common Fund). BOA will not be making any payment to the Cash Payment Common Fund of any of the $29.1 million dollars going to the Debt Reduction subgroup. As a direct result, only the Cash Payment Common Fund, created to pay the Cash Payment subgroup, will be used to pay attorneys' fee, incentive awards and the costs of administration. The Debt Reduction subgroup's $29.1 million goes entirely to BOA's setoff of Debt Reduction subgroup members accounts. Not a single dollar of the $29.1 million goes toward payment of Class Counsel's attorneys' fees, the incentive awards and the costs of administration. Arithmetically, the Cash Payment subgroup should only pay 56.3 % of the attorneys' fees, the incentive awards, and the costs of administration ($37.5 million plus $29.1 million equals $66.6 million. Dividing $37.5 million by $66.6 million yields 56.3 percent). Without disparate treatment, the Debt Reduction subgroup would pay the remaining 43.7% of the attorneys' fees, the incentive awards, and the costs of administration ($37.5 million plus $29.1 million equals $66.6 million. Dividing

$29.1 million by $66.6 million yields 43.7 percent).

The solution is simple. Cash Payment subgroup members should not be paying the attorneys' fees, and the administrative costs of the Debt reduction subgroup from their Cash Payment Common Fund, with the concomitant lowering of the Cash Payment subgroup's pro rata share of the settlement. To do equity, the Court has several options:  (1) Create a subclass for Debt Relief  to attempt negotiations as set forth above; (2) Require that the Class definition be revised to exclude the Debt Relief  absent class members; or (3) reduce Class Counsel's attorneys' fees by 43.7 % to start, and then reduce the non-fees costs by an additional amount equal to 43.7% of the total administrative costs.

When attorneys' fees are paid out of a common fund, "the class's lawyers occupy a position adversarial to the interests of their clients" and "the district court has a special duty to protect the interests of the class." *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. As Judge Posner of the Court of Appeals for the 7th Circuit has noted: "The defendant ... is interested only in the bottom line: how much the settlement will cost him. And class counsel, as "economic man," presumably is interested primarily in the size of the attorneys' fees provided for in the settlement, for those are the only money that class counsel, as distinct from the members of the class, get to keep. The optimal settlement from the joint standpoint of class counsel and defendant, assuming they are self-interested, is therefore a sum of money moderate in amount but weighted in favor of attorneys' fees for class counsel. Ordinarily -- in this case dramatically --individual members of the class have such a small stake in the outcome of the class action that they have no incentive to

monitor the settlement negotiations or challenge the terms agreed upon by class counsel and the *defendant. Redman* v. Radio Shack Corp., 768 F.3d 622, 629 (7th Cir. 2014).

Thus, in this matter, as in all class actions, the attorney's fees and the compensation to the class members are intertwined, as BOA had a limit of how much cash it is willing to pay to be released from all claims regarding its $35 Extended Overdrawn Balance Charges ("EOBC").

Perhaps it is unintentional; but the proposed settlement in this matter minimizes BOA's out of pocket cost and maximizes Class Counsel's attorney fees.

As conceded in the Joint Response, none of the named plaintiffs are members of the Debt Relief Subgroup. Therefore, none of the named plaintiffs has a claim typical of the Debt Relief Subgroup - which, as this Court has noted, provides $29.1 million in debt reduction to class members whose BOA accounts were closed with an outstanding balance stemming from one or more EOBC's levied during the class period.

Each eligible Debt Reduction subgroup member will only receive up to $35 in debt reduction. The Court has no information regarding the number (or percentage) of Debt Reduction subgroup members whose BOA account balance is currently $35 or less. Admittedly, Objector Sanchez's counsel doesn't see how any subgroup member will owe $35 or less to BOA. But, accepting that such Debt Reduction subgroup members exist, it is only that subgroup of the Debt Reduction subgroup that will receive any benefit from the credit bureau reporting portion of the proposed settlement. For Debt Reduction subgroup members that owe more than $35, the relief is ephemeral. i.e., their credit report will still show an unpaid smaller amount to BOA.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III

## WHETHER EACH SUBGROUP HAS REPRESENTATION AMONGST THE NAMED PLAINTIFFS

No, each subgroup is not represented among the named plaintiffs. As conceded by the Joint Response, (Doc 128), none of the named plaintiffs is a member of the Debt Reduction subgroup. So, in violation of F.R.Civ.P. 23(a)(3) the claims of the representative parties (named plaintiffs) are not typical of the claims of the Debt Reduction subgroup.

The cases cited by class counsel and BOA at page 21 of their Plaintiffs' and Defendant's Joint Response to the Court's Order to Show Cause (Doc 128) do not support a finding of commonality in this case.

For example, in *Case v. French Quarter III LLC* USDC DSC Case No. 9:12-cv-02518 (Doc 292) beginning at page 9, US District Judge Davis C. Norton wrote:

3. Typicality Rule 23(a)(3) requires that "the claims or defenses of the representative parties"

be "typical of the claims or defenses of the class." "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 155 (1982) (internal quotation marks omitted) (emphasis added). The essence of this requirement "is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter v. Microsoft Corp*., 436 F.3d 461, 466 (4th Cir. 2006) (quoting

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG
10

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)) (emphasis added). "The typicality requirement goes to the heart of a representative parties' ability to represent a class" and "tends to merge with the commonality and adequacy-of-representation requirements." *Id.*

The Named Plaintiffs assert claims against Defendants arising out of their alleged involvement in the development, sale, and financing of the Buildings 8 and 9 at the French Quarter Resort. The Named Plaintiffs assert causes of action for breach of contract, negligence, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, conspiracy, Missouri Merchandising Practices Act violation, and money had and received against all Defendants as well as a cause of action under R.I.C.O., 18 U.S.C. § 1962 against the Taylor Defendants. Additionally, the Plantation Title Action asserts claims against various defendants arising out of their alleged roles in failing to close, settle, and obtain title insurance for class members' timeshare interval purchases. Plaintiffs asserted causes of action for breach of contract, negligence, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conspiracy, and Missouri Merchandising Practices Act violation against all Defendants as well as causes of action for money had and received, conversion, and claim and delivery against some Defendants. The underlying facts supporting the Named Plaintiffs' claims are fully set forth in the complaints and in the Joint Motion for Class Settlement.

The Named Plaintiffs' claims against Defendants encompass all claims an absent class member might have. Because the Defendants' potential liability to the Settlement Class Members

is based on the Defendants' conduct, the resolution of those liability issues for the Named Plaintiffs would likely be the same as for the entire class. Although the Defendants have raised issues regarding the statute of limitations that might distinguish Settlement Class Members, the claims of the Named Plaintiffs are typical of the entire Settlement Class and arise from the same conduct.

In this matter the named plaintiffs are all still Bank of America customers. Their only damage was paying a $35 Extended Overdrawn Balance Charge (EOBC) to BOA - on one or more occasions.

On the other hand, the unrepresented Debt Reduction subgroup were treated differently. When the Debt Reduction subgroup members were unable to pay BOA the original overdraft amount, plus the $35 overdraft fee or fees, plus the $35 EOBC, their accounts were closed after 120 days, and, thereafter the delinquent account information was reported to a credit bureau. This is true whether or not in the past the Debt Reduction subgroup member had paid multiple $35 overcharges and $35 EOBC charges to BOA.

In addition, as stated above, had the Debt Reduction subgroup been represented by someone who had damages typical of the Debt Reduction subgroup, negotiations for a some actual cash could have been raised. And, it is likely that they would have been front center telling the court that subgroup members' credit report shows a 70+ dollar unpaid debt to BOA will see no improvement in their credit when BOA forgives $35 of that 70+ dollar debt.

In *Purdie v. Ace Cash Express, Inc.*, Case 3:01-cv-01754 USDC NDTX the damages to

class members arose out of usurious payday loans. Purdie, the named plaintiff represented a class of people who had made payday loans and, because they couldn't repay the payday loans, and who, as a consequence, suffered oppressive collections practices from the defendant lenders. The settlement relief for named plaintiff Purdie and her fellow class members was debt relief valued at $50 million. It is true that the Settlement also provided for the creation of an $11 million cash fund from which to pay class counsel's fees (approximately 20% of the 11 million), and cash payments - from $7.50 to $45 to any class member who had repaid their payday loan in full. Because the settling parties had no real expectation that anywhere near the remaining 80% of the $11 million would be claimed; they created cy pre for the expected difference between $2.5 million in actual cash claims and actual claims made.

It is important to read that class counsel, in the submission of Plaintiff's Brief in Support of Motion for Provisional Class Certification, Preliminary Approval and Other Relief (Doc 56), failed to cite a single case for the proposition that typicality did not require a class member with typical damages of a subclass to represent a subclass. Therefore, citing to Purdie only establishes that under remarkably different facts, a district court allowed a non-interested named plaintiff, and class counsel, to represent a subclass, which at the end of the day, receive little or nothing - because no one was looking out for the best interests of the subclass.

In *Cullen v. Whitman Med. Group*, 197 F.R.D. 136 (E.D. Pa. 2000) US District Judge Anita B. Brody wrote:

"On March 3, 1999, I ordered the parties to participate in a settlement conference

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG
13

before Magistrate Judge Welsh. Several settlement conferences took place between April and December of 1999, but no agreement was reached. Throughout this period, both parties actively pursued discovery. Plaintiffs posit that a major turning point in the case was the October 29, 1999 oral argument. On that day, I heard argument on several of plaintiffs' pending motions to compel. I ordered immediate production of certain documents and I made myself available for weekly conferences to assure there would be no further discovery abuses. As an offshoot of the conference program, on January 31, 2000 I began a series of settlement conferences with the parties. Finally, on May 4, 2000, working with the parties the entire day and into the evening, a settlement sum was reached. Subsequently, the parties worked together to negotiate the non-monetary terms of the settlement agreement."

Nowhere in the opinion does Judge Brody discussed typicality. Nor does her opinion even imply that in the case before her there were two or more subclasses. So, whatever else it stands for, *Cullen v. Whitman Med. Group*, does not explicitly or implicitly deal with typicality.

In *Desantis v. Snap-On Tools Co., LLC*, Civil Action No. 06-cv-2231 (DMC), 2006 U.S. Dist. LEXIS 78362 (D.N.J. Oct. 27, 2006) US District Judge Dennis M. Cavanaugh explained that he found typicality because of the alignment of interest of all class members. In discussing rule 23(a) requirements, Judge Cavanaugh wrote

"The typicality requirement is also met here because the interests of the Class and the Lead Plaintiffs are "aligned." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516,

531 (3d Cir. 2004). Specifically, the claims of the Plaintiffs and of the Class arise from the same alleged deceptive business practices and therefore their interests are properly aligned."

In this matter there is no such alignment. The interests of each subgroup arise out of the same behavior on the part of the defendant, but the consequences and damages bear no relationship. As a direct and proximate result of the differing consequences and damages, the proposed settlement - without consideration of class counsels requested attorney's fees - is an excellent result for the Cash Payment subgroup. Not so for the Debt Reduction subgroup. Their relief is largely an illusion. It is certainly true that BOA will as a bookkeeping matter reduce each Debt Reduction subgroup members debt by $35. However, since there is little likelihood of anyone in the Debt Reduction subgroup only owing BOA $35, the debt reduction is largely ephemeral. Furthermore, it's hard to imagine how BOA reporting that a person's debt is smaller than originally reported will make any difference on that person's credit report.

1

2

**IV**

3

**THE AMOUNT OF EOBC CAUSED DEBT OWED BY THE DEBT PORTION GROUP AND THE NUMBER OF CLASS MEMBERS THAT FALL INTO THE DEBT PORTION GROUP. THE SUM OF EOBC PAYMENTS MADE BY MEMBERS OF THE CASH PORTION GROUP AND THE NUMBER OF MEMBERS THAT FALL INTO THE CASH PORTION GROUP**

4

5

6

7

    At the time of the settlement agreement there would have been 831,428 customers in the

8

Debt Reduction sub group ($29.1 million divided by $35 equals 831,4228), and a significantly

9

larger group in the Cash Payment subgroup who paid $861.97 million in ECOBs to BOA.

10

Assuming the truth of the numbers the Joint Response, (Doc 128), Cash Payment subgroup

11

members paid, on average, four (4) $35 ECOBs to BOA during the class period.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OBJECTOR ESTEFANIA OSORIO SANCHEZ'S RESPONSIVE BRIEF AS DIRECTED BY
THIS COURT'S JUNE 28, 2018 ORDER TO SHOW CAUSE
CASE NO. 3:16-cv-00492-L-WVG

## V

**WHETHER THERE ARE ANY CLASS MEMBERS WITH UNCLOSED ACCOUNTS WHO WERE CHARGED EOBCS DURING THE CLASS PERIOD AND NEVER PAID THEM. IF SO, HOW MANY SUCH CLASS MEMBERS THERE ARE AND HOW MUCH CLASS PERIOD EOBC DEBT THEY OWE**

Based on the BOA policy, as expressed in the joint account, accounts with unpaid ECOBs were closed after 120 days. So, baring human error, one would not expect any Debt Reduction subclass members to have currently open accounts.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

F.R.Civ.P. 23(a) provides "Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

In this matter the forgoing establishes that, because they are all members of the Cash Payment subgroup, the named plaintiffs' claims are not typical of the claims of the Debt Reduction subgroup's claims. Despite the settling parties' arguments that commonalty subsumes typicality, it is not true. Thus, the named plaintiffs clearly lack Rule 23 (a) (3) Typicality with regard to Debt Reduction subgroup claims. Under rule 23(a) this Court should appoint a Debt Reduction subgroup member, and their counsel, to renegotiate the Debt Reduction subclass' portion of the settlement. Alternatively, the Court could require Class Counsel to narrow the class definition as a condition of approval, or the Court could significantly reduce the administrative costs and attorneys' fees to be attributed to the Debt Relief subgroup.

Furthermore, even if the Court were to overlook the typicality issue and approve the proposed settlement; it would be overtly inequitable for the Cash Payment subgroup members to then be required to pay the attorneys' fees, and the administrative costs of the Debt Reduction

subgroup from their Cash Payment Common Fund. Such payment by the Cash Payment

subgroup would result in an inequitable concomitant lowering of the Cash Payment subgroup's

pro rata share of the settlement.

To rectify this problem equitable problem created by BOA and Class Counsel, the Court

should first reduce Class Counsel's attorneys' fees by 27.1/66.6 (43.7 % ). That reduction results

in Cash Payment subgroup members only paying attorneys' fees for the relief they received. Then

the Court should reduce Class Counsel's attorneys' fees by 27.1/66.6 (43.7 % ) of the total

administrative costs paid out of the Cash Payment common fund.

Dated August 13, 2018                    Respectfully submitted,


                                         /s/ Michael D. Luppi.
                                         Michael D. Luppi, Esq.
                                         California Bar Number-55865
                                         Law Office Michael D Luppi
                                         11366 Christy Ave.
                                         Sylmar, CA  91342
                                         Phone Number: (818) 897-3344
                                         Fax Number: (323) 726-3106
                                         luppiacct@gmail.com
                                         Attorney for Objector Estefania Osorio Sanchez