UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANNE FARRELL, et al.<br><br>                       Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>                       Defendant. | Case No.: 3:16-cv-00492-L-WVG<br><br>**ORDER GRANTING (1) MOTION [Doc. 104] FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND (2) MOTION [Doc. 80] FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE AWARDS** |

     Pending before the Court are Class Counsel's unopposed motions for final approval of class action settlement and final approval of fees, costs, and service awards. The Court has considered the motions on file, all timely objections, and oral argument presented by Class Counsel, counsel for Defendant Bank of America ("BoA"), and counsel for Objector Rachael Threatt at the final approval hearing held on June 18, 2018. For the following reasons, the Court hereby **GRANTS** both motions.

//

//

//

//

//

1

3:16-cv-00492-L-WVG

## I. PROCEDURAL BACKGROUND

This case is a putative class action focused on BoA's practice of levying $35 fees against deposit account holders for failing to rectify an overdrawn deposit account within five days. To open a deposit account with BoA, a customer had to first execute a Deposit Agreement [Doc. 8-3]. Under the terms of the Deposit Agreement BoA charged a $35 fee anytime a deposit account holder wrote a check against insufficient funds. When a deposit account holder thus over drafted his or her account, BoA had discretion as to whether to honor the overdrawn check by advancing funds to the payee sufficient to cover the note. However BoA levied the Initial Charge whether it advanced the funds or not. In the event BoA advanced the funds, deposit account holders were obligated under the Deposit Agreement to pay back BoA's advance plus any fees incurred. Failure to do so within five days triggered a $35 Extended Overdrawn Balance Charge ("EOBC").

Plaintiff wrote some checks against insufficient funds. BoA honored the checks but charged her $35 fee for not having sufficient funds. When Plaintiff failed to remedy her negative account balance within five days, BoA levied EOBCs. Because the EOBCs, as a percentage of her negative account balance, exceeded the interest rate permitted by the National Banking Act, Plaintiff filed this putative class action against BoA, alleging violation of 12 U.S.C. §§ 85, 86 (the "NBA").

A significant amount of pretrial activity followed. BoA moved to dismiss Plaintiff's Complaint, arguing that the EOBCs were not "interest" and therefore cannot trigger the NBA. (MTD [Doc. 8].) The Court disagreed, and therefore denied BoA's motion. (MTD Order [Doc. 20].) BoA subsequently answered and then amended their answer, and Plaintiff twice moved to dismiss certain of BoA's affirmative defenses. (Docs. 25, 40, 41, 45.) In part because every other court to consider the issue had held that EOBCs do not constitute interest, this Court found that there was substantial ground for a difference of opinion on the issue. (April 11, 2017 Order [Doc. 61].) The Court therefore granted BoA's motion for certification of an interlocutory appeal of the denial of BoA's motion to dismiss. (Id.)

BoA petitioned the Ninth Circuit for a permissive interlocutory appeal on April 21, 2017. (Doc. 62.) Plaintiff answered. (9th Cir. Case No. 17-80072 ["Appeal"] Doc. 4.) The Ninth Circuit Granted BoA's Petition. (Doc. 63.) While the permissive appeal was pending before the Ninth Circuit, the parties participated in settlement negotiations, exchanged informal discovery, and attended mediation before the Honorable Layn Philips (Ret.), a highly respected neutral. Through these efforts, the parties successfully reached a settlement agreement in early October 2017. After conducting confirmatory discovery and reducing terms to writing, the parties formally executed the Settlement Agreement on October 31, 2017 and requested preliminary approval. On December 21, 2017, the Court granted preliminary approval. (Prelim. Appr. [Docs. 72, 75].) Plaintiffs now move unopposed for certification of a settlement class, final approval of the settlement, final approval of attorneys' fees and costs award, and final approval of service awards for named plaintiffs.

## II. THE SETTLEMENT

In exchange for the release of class members' claims, the settlement agreement ("Agreement" [Doc. 104-2]) provides four forms of consideration:

1. BoA ceases charging EOBCs for five years beginning December 31, 2017. (Agreement § 2.2(a).) BoA's obligation will terminate during this timeframe only if the United States Supreme Court expressly holds that EOBCs or their equivalent do not constitute interest under the NBA. (Id.) BoA testifies that this cessation will depress their revenue (and benefit BoA deposit account holders) by approximately $20,000,000 per month, or **$1.2 billion** total over the five year period. (Bhamani Decl. [Doc. 104-4].)

2. BoA provides cash payment ("Cash Portion") of **$37.5 million** to class members who (1) were charged an EOBC and (2) did not have their EOBC refunded or charged off. (Settlement Agreement § 2.2(b)(3).) Attorneys' fees ($14.5 million), costs ($53,119.92), named plaintiff service awards ($20,000), and settlement

administrator hourly charges (approximately $62,242.00 [Doc. 122-1 ¶33]) will come off the top. (Id. § 1.4, 1.24, 2.2(b)(3).) The residue (approximately $22,864,638) to issue pro rata based upon how many EOBC's each qualifying class member paid as a percentage of all EOBC's paid by the class during the class period. (Id. § 2.2(b)(3).) Class members who do not opt out will receive their payment automatically.

3. BoA provides debt reduction ("Debt Reduction") in the amount of at least **$29.1 million**. Debt Reduction will issue to class members whose BoA accounts closed with an outstanding balance stemming from one or more EOBC's levied during the class period. Each eligible class member will receive up to $35 in debt reduction. To the extent BoA reported any of this debt to the credit bureaus, BoA will update the Bureau's as to the effect of the debt reduction. This debt reduction will issue automatically to all qualifying members who do not opt out. It will apply only to debt which BoA has a legal right to collect. It will not apply to unenforceable debt, such as debt discharged in bankruptcy. (Trial Tr.)

4. BoA is paying all settlement administration costs other than the administrator's hourly service charges. These costs are currently estimated at $2.9 milliion. (Doc. 122-1 ¶33.)

If there is any residual Cash Portion settlement funds after the first distribution, the residue will go to the class by way of a secondary distribution, if economically feasible. Otherwise, the residue will go to the Center for Responsible Learning as *cy pres* beneficiary. None of the settlement funds will revert to BoA.

Email and / or physical mail notices went out to 7,078,199 class members. (Doc. 122-1 ¶ 21.) Only one hundred class members opted out. (Id. ¶ 26.) Eleven class members have filed timely objections. (Docs. 82, 84–86, 88, 90–93, 101.) Class member Rachael Threatt ("Threatt") was the only objecting class member to appear at the final approval hearing ("Hearing"), entering an appearance through counsel Theodore Frank.

## III. SETTLEMENT CLASS CERTIFICATION

Plaintiffs seek settlement only class certification under Fed. R. Civ. P. 23(a) and (b)(3) of the same settlement class the Court preliminarily certified: "All holders of [BoA] consumer checking accounts who, during the period between February 25, 2014 and December 30, 2017, were assessed at least one [EOBC] that was not refunded." (Doc. 72 § 2.)

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "A party seeking class certification must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and the requirements of at least one of the categories under Rule 23(b)." *Wang v. Chinese Daily News, Inc.*, 709 F.3d 829, 832 (9th Cir. 2013).

### A. Rule 23(a)

Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. "The Rule's four requirements – numerosity, commonality, typicality, and adequate representation – effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (internal quotation marks and citations omitted).

#### 1. Numerosity

The numerosity element is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the class numbers around seven million. The numerosity element is clearly satisfied.

#### 2. Commonality

Under Rule 23(a)(2), Plaintiffs must demonstrate that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Supreme Court has held that plaintiffs must demonstrate "the capacity of a classwide proceeding to generate common answers" to common questions of law or fact that are "apt to drive the resolution of the

litigation." *Dukes,* 564 U.S. at 350 (internal citations and quotations marks omitted). However, "[a]ll questions of fact and law need not be common to satisfy this rule." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998). "The common contention ... must be of such a nature that ... its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* A single common question is sufficient to satisfy the commonality element. *Dukes*, 131 S. Ct. at 2556. Here, the common, dispositive issue of whether EOBCs constitute interest for purposes of the NBA satisfies the commonality element.

3. Typicality

The typicality requirement of Rule 23(a)(3) focuses on the relationship of facts and issues between the class and its representatives.

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

*Dukes*, 131 S. Ct. at 2551 n.5 (internal quotation marks and citation omitted). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citations and quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal citations and quotation marks omitted).

//

Here, the named plaintiffs are typical of the class they seek to represent. They suffered the same injury from the same course of conduct as did unnamed members. To wit, like the unnamed members, BoA charged them with EOBCs. Named plaintiffs therefore meet the criteria of Rule 23(a)(3).[1]

### 4. Adequacy

To serve as class representative, one must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is aimed at protecting the due process rights of absent members who will be bound by a class action judgment. *Hanlon,* 150 F.3d at 120; *Richards v. Jefferson Cnty.*, Ala., 517 U.S. 793, 801 (1996). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 120 (citation omitted).

Named plaintiffs and Class Counsel have demonstrated their ability to vigorously prosecute this action on behalf of the class.[2] Thus, the only question as to adequacy is whether there exists a conflict of interest between named plaintiffs and the class as a whole that would render named plaintiffs inadequate representatives. Objector Estafania Sanchez ("Sanchez") complains that the interests of the Debt Portion recipients are "entirely different" and in conflict with the interests of the Cash Portion recipients. (Sanchez Objection [Doc. 88] ¶ 3.) In support of this argument, Sanchez cites to *Amchem Products Inc. v. Windsor*, 52 U.S. 591 (1997). In *Amchem*, an asbestos exposure case, the Supreme Court held that there was an insufficient alignment of the interests of

---

[1] Objector Sanchez seeks to raise typicality arguments for the first time in her response to the Court's Order to Show Cause, which did not request briefing on the issue of typicality. She did not raise typicality concerns in a timely objection. In any event, the Court, for the reasons stated, is satisfied that the typicality element is met.

[2] The Court further elaborates on this point below under the portion of this order approving Class Counsel's fee award.

7

plaintiffs who presently suffered exposure related injury and plaintiffs who had no present symptoms but could potentially experience them at a later time. *Id.* at 626. To wit, the former had an interest in maximizing immediate payment while the latter had a conflicting interest in maximizing a reserve fund for future claims with built in inflation adjustments. *Id.*

Because it seemed feasible that the Cash Portion recipients may have an interest in maximizing the cash value of the settlement while the Debt Portion recipients may have a possibly conflicting interest in maximizing the debt forgiveness, the Court ordered further briefing on this issue. (OSC [Doc. 125].) In their responsive briefing, BoA and Class Counsel cite to *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liability Litig.*, 895 F.3d 597 (9th Cir. 2018), a decision that issued eleven days after the OSC.

In *Volkswagen*, the settlement at issue stemmed from Volkswagen's decision to install "defeat devices" in some of its vehicles. *Volkswagen,* 895 F.3d at 603. These defeat devices triggered during smog inspections and reduced the vehicles' emissions to a legally acceptable level. *Id.* The settlement involved making payments to class members depending in part upon to which of two subgroups a class member belongs. One subgroup consisted of class members who had not sold their vehicles. Members of this subgroup received the option to either have their vehicles fixed or to sell them back at the pre-defeat device price. *Id.* at 604. Members of this subgroup also received a cash restitution payment of at last $5,100 if they purchased their vehicle before September 18, 2015, the date the defect became publically known ("Eligible Owners"), and half that amount in cash restitution if they purchased their vehicle after that date ("Eligible New Owners"). *Id.* Another group consisted of those who had sold their vehicles after the defect became publically known ("Eligible Sellers"). Members of this group received only a restitution payment, which was equal to one half the restitution afforded to Eligible Owners and the same as that afforded to Eligible New Owners.

An objector challenged class certification on the basis of adequacy, arguing that there was a conflict of interest between owners and sellers and inadequate representation of the latter. *Volkswagen*, 895 F.3d at 606–7. As evidence of inadequate representation, the objector complained that it was unfair that Eligible Sellers received the same amount as Eligible new buyers, given that the latter made their purchase after receiving construction knowledge of the defect. *Id.* In finding that the district court did not abuse its discretion in certifying the settlement class, the Ninth Circuit reasoned that no conflict of interest existed sufficient to render the representation inadequate because (1) the Eligible Sellers had much weaker claims than the Owners and thus benefited from the bargaining power of the latter and (2) the settlement fairly compensated sellers for their actual economic losses. *Id.* at 608–9.

As with the members of the Eligible Sellers group in *Volkswagen*, members of the Debt Portion group here are fairly compensated for their actual economic losses stemming from unpaid EOBCs. Indeed, Debt Portion recipients will receive complete EOBC debt forgiveness. (OSC Response [Doc. 128] 8:5–6 n.3; BoA Decl. [Doc. 128 –2] ¶3.) It is true that the Cash Portion recipients, by contrast, will recover less than one hundred percent of their economic loss. But this comparably less favorable treatment of Cash Portion recipients is not grounds for finding an improper conflict of interest because the named plaintiffs include only Cash Portion recipients and do not include any Debt Portion recipients. (OSC Response 7:15–25.) To the contrary, the fact that the least represented group appears to have received the more favorable treatment would seem to suggest a lack of self-dealing on the part of the named representatives. Accordingly, the Court finds that the representation in this case satisfies Fed. R. Civ. P. 23(a)(4).

//
//
//
//
//

**B.     Rule 23(b)(3)**

Plaintiff seeks class certification under Rule 23(b)(3). Where, as here, the requirements of Rule 23(a) are met, class certification is proper under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Wang,* 709 F.3d at 832.

Here, there is no dispute as to the fact that the legal question of whether EOBCs constitute interest predominates and a class action is the superior method by which to resolve this common question. Accordingly, the Court certifies for settlement purposes only the class as defined in paragraph 2.1 of the Settlement Agreement.

**C.     Notice**

A prerequisite to final approval is a finding of adequate notice to the class. Fed. R. Civ. P. 23(e). In the preliminary approval order, the Court approved the form, content, and method of providing notice proposed by the Parties. The Settlement Class Notices were thereafter distributed to members of the Settlement Class pursuant to the terms of the Preliminary Approval Order. (See Docs. 104–3; 122–1.) Objector Estafania Sanchez complains that notice was inadequate because it failed to inform class members as to how much damage the class as a whole suffered and how many class members will share in the settlement.

Both contentions lack merit. Through banking records and notices, each class member should be in a position to know, or at least learn, how much damage they personally suffered from EOBCs. Furthermore, the notice to the class informed members of the amount of the settlement as well as an estimate of the number of people in the class. (See Doc. 73–2 pp. 3–4.) Armed with this information, class members were in a position to roughly calculate the average payout and compare that to their individual damages. The Court therefore finds that the Class Notices given to Settlement Class

members adequately informed Settlement Class members of all material elements of the proposed Settlement and constituted valid, due, and sufficient notice to Settlement Class members. The Court further finds that the Notice Program satisfies due process and has been fully implemented.

## IV. SETTLEMENT FAIRNESS

In determining whether a class action settlement is fair, adequate, and reasonable, the Court considers what are known as the *Hanlon* factors, which are:

> (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Gutierrez-Rodriguez v. R.M. Galicia, Inc.*, No. 16-cv-00182 H-BLM (S.D. Cal. 2017) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). When a court exercises its discretion to approve a settlement, the Ninth Circuit has instructed:

> [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned.

*Officers for Justice v. Civil Serv. Com.*, 688 F.2d 615, 625 (9th Cir. 1982). "The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Id.* (emphasis in original).

On balance, the Court finds that the *Hanlon* factors strongly support settlement approval. As noted above, every other court to consider the question of whether EOBCs constitute interest for purposes of the usury laws has answered it in the negative. Were litigation in this case to continue, Plaintiffs would face a risk of losing at the appellate

11

level on this legal question.  Furthermore, the distance between the present posture of this case and any recovery other than by settlement is substantial.  To succeed, Plaintiffs would need to defeat BoA's permissive interlocutory appeal of the EOBC/interest issue; engage in formal discovery; win a contested class certification motion; survive summary judgment; win at trial; and successfully defend on likely at least one level of post-trial appeal.  Considering Bank of America is a highly sophisticated and well represented defendant, Plaintiffs would almost certainly encounter substantial difficulty and expense in fully litigating this case.

The amount offered in settlement also supports approval.  Most importantly, the injunctive relief, estimated at about $1.2 billion, is substantial.  Further, the $37.5 million in cash and $29.1 million in debt relief alone amounts to about nine percent of the maximum amount the Class could recover through trial.  (Joint Decl. [Doc. 104–3] ¶ 30.)  Compared to the risk and expense of continued litigation, a present recovery of nine percent is meaningful.  It is thus not surprising that only one hundred members of the more than seven million person class elected to opt out.

Some objections complain that the $29.1 million in debt relief is illusory because (1) forgiving the debt may cost BoA very little considering it likely did not expect to recover most if not all of this debt and (2) Debt Portion recipients will benefit little from forgiveness of debt that they did not intend to pay.  While it may be true that it will cost BoA very little to provide the Debt Portion relief, it does not follow that the relief is meaningless to Debt Portion recipients.  This debt, at present, is legally enforceable.  BoA could initiate proceedings to collect.  Alternatively, BoA could sell the debt at a discount to another entity that might be more willing to undertake collection efforts.  The Debt Portion relief immunizes recipients from worrying about or suffering through any efforts to collect on this debt.  The Debt Portion relief will also benefit recipients in the form of the improved credit scores some class members will realize once BoA reports the debt relief to the credit bureaus.

12

3:16-cv-00492-L-WVG

Finally, the quality and tenacity of Class Counsel's work on this case (discussed in more detail below) and the presence of a highly respected neutral in negotiations further satisfies the Court that this settlement was reached through arms' length negotiations and not collusion. For these reasons, the Court approves the Agreement as fair, reasonable, adequate, and in the best interest of the Settlement Class members.

## V. ATTORNEYS' FEES

In their Motion for Fees and Costs, Class Counsel sought $16.65 million in fees, 25% of the 66.6 million dollar aggregated value of the cash and debt reduction payments. Class Counsel has since reduced their fee prayer to $14.5 million, which amounts to 21.1 % of the proposed cash and debt reduction payments. (Doc. 106.) The bulk of settlement objections focus on this prayer, contending it is unreasonable.

In common fund cases such as this, the Court has discretion to employ either the percentage of the fund method or the lodestar method to calculate a proper fee award. *In re Bluetooth Headset Prods. Liab. Lit.*, 654 F.3d 935, 942 (9th Cir. 2011). In determining fees, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the Court awards some specific percentage of the fund as fees. The Ninth Circuit benchmark rate is twenty five percent. *Bluetooth*, 654 F.3d at 942. Here, Class Counsel purports to request only a 21.1% take of the common fund, which includes the Debt ($29.1 million) and Cash ($37.5 million) Portion relief (the "denominator"). Objectors contend that Class Counsel's prayer for $14.5 million is actually more than 21.1% because the Debt Portion relief is illusory and thus should not be included in the denominator. As explained above, the Court does not believe the Debt Portion relief is illusory. Furthermore, assuming *arguendo* that it was illusory, the Court finds that the staggering $1.2 billion dollars in injunctive relief is

worth substantially more than $29.1 million to the denominator. The Court therefore calculates Class Counsel's prayer at 21.1% of the common fund.

Meeting the benchmark rate does not end the analysis because "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). Factors courts commonly consider in determining a reasonable percentage include the result obtained; the reaction of the class; the effort, experience, and skill of counsel; complexity of issues; risks of nonpayment assumed by class counsel; and comparison with counsel's lodestar. *Ruiz v. Xpo Last Mile, Inc.*, 2017 WL 6513962 * 7 (S.D. Cal. 2017) (Sammartino, J.) (Internal citations and quotations omitted.)

As explained above under the settlement fairness analysis, the result obtained here by Class Counsel is remarkable. The value of the Cash Portion and Debt Portion relief alone strongly supports the requested fee. Consideration of the $1.2 billion in injunctive relief to class members and to BoA deposit account holders generally makes the inquiry much easier. Indeed, forcing a bank of BoAs stature to cease a lucrative banking practice like charging EOBCs is a meaningful accomplishment. Which would explain why Class Members seem to have reacted very favorably–only one hundred members out of the more than seven million member class opted out. This accomplishment is made all the more remarkable by the fact that Class Counsel faced a substantial risk of non-payment in confronting the adverse legal landscape on the issue of whether EOBCs constitute interest.

Class Counsel achieved this result through tenacity and great skill. In all of their written submissions and in their presentation at the Final Approval Hearing, Class Counsel's arguments were laudably clear and precise, no small feat given the complexity of the legal questions at issue here. It is clear that substantial preparation went into all of Class Counsel's work on this case. Though Class Counsel achieved the Settlement before commencement of formal discovery, a cursory glance at the docket demonstrates that this was a hard fought battle. Class Counsel had to oppose a motion to dismiss,

move twice to strike affirmative defenses; oppose a petition for interlocutory appeal; answer an appeal; engage in settlement talks and informal discovery; prepare for and attend mediation; move for preliminary approval; effectuate notice; respond to objections; prepare for and attend the Final Approval Hearing; and respond to the Court's Order to Show Cause.

Objectors contend that the Court should nevertheless apply the lodestar cross check. Here, the Court has discretion to not apply the lodestar cross check. *Bluetooth*, 654 F.3d at 942 (stating "[w]here a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ either the lodestar method or a percentage-of-recovery method)*; In re Google Referrer Header Privacy Litig.,* 869 F.3d 737, 748 (9th Cir. 2017) (stating "*[a]lthough not required to do so*, the district court took an extra step, cross checking this result by using the lodestar method.") The Court therefore finds it proper to exercise this discretion and not apply the lodestar cross check.[3] Because the requested 21.1% is significantly below the benchmark rate of 25%, and because of how high Class Counsel scores on the factors analyzed above, the Court finds that the requested fee is reasonable. The Court therefore **GRANTS** Class Counsel's motion for fees and awards $14.5 million.

## VI.  COSTS AND SERVICE AWARDS

Class Counsel seeks $53,119.92 in costs and $20,000 in service awards to the named plaintiffs. None of the objectors contest these requests. The Court finds these amounts reasonable to compensate Class Counsel for the costs expended in litigating this case and the named plaintiffs for their service to the settlement class and in this action. Class Counsel's prayer for costs and services awards is **GRANTED**.

---

[3] The Court therefore **DENIES AS MOOT** Class Counsel's Motion to Seal [Doc. 110].)

## VII. Conclusion and Order

For the foregoing reasons, the Court **OVERRULES** all objections and **GRANTS** Class Counsel's unopposed motions for final approval of class action settlement and final approval of fees, costs, and service awards. The Court further orders as follows:

- The Amended Complaint (Doc. 78) is dismissed with prejudice.
- The one hundred class members who opted out are not bound by this settlement agreement. (Doc. 122-1 Attachment 5.)
- Provided it is economically feasible, should any funds remain after the initial distribution of the class member awards, the parties shall do a second distribution to Settlement Class members who received their class member awards, provided it was by direct deposit or by negotiated check. (Agreement ¶ 3.5.) Should residual funds remain following a second distribution, or in the event a second distribution is not economically feasible, the Parties shall distribute the remaining funds, if any, to *cy pres* recipient, Consumers for Responsible Lending (www.responsiblelending.org), a non-profit organization that fights against abusive financial practices.
- Objector Collins motion [Doc. 119] for leave to file an amended Reply is **DENIED**. To properly assess the fairness of the settlement and the requested fees, it is not necessary for the Court to determine whether Objector Collins' attorney verbally indicated to Class Counsel that his client was satisfied by the $2 million reduction in Class Counsel's prayer for fees. The Court assumes Collins did not retract her objection, and overrules it.
- The Court retains jurisdiction over implementation and enforcement of the Agreement.

1 **IT IS SO ORDERED.**

2 Dated: August 31, 2018

*M. James Lorenz*
Hon. M. James Lorenz
United States District Judge